(Slip Opinion) OCTOBER TERM, 2014 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WELLNESS INTERNATIONAL NETWORK, LTD., ET AL. *v.* SHARIF

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 13–935.   Argued January 14, 2015—Decided May 26, 2015

Respondent Richard Sharif tried to discharge a debt he owed petition- ers, Wellness International Network, Ltd., and its owners (collective- ly Wellness), in his Chapter 7 bankruptcy.  Wellness sought, *inter alia*, a declaratory judgment from the Bankruptcy Court, contending that a trust Sharif claimed to administer was in fact Sharif's alter- ego, and that its assets were his personal property and part of his bankruptcy estate.  The Bankruptcy Court eventually entered a de- fault judgment against Sharif.  While Sharif's appeal was pending in District Court, but before briefing concluded, this Court held that Ar- ticle III forbids bankruptcy courts to enter a final judgment on claims that seek only to "augment" the bankruptcy estate and would other- wise "exis[t] without regard to any bankruptcy proceeding." *Stern* v. *Marshall*, 564 U. S. ___, ___.  After briefing closed, Sharif sought permission to file a supplemental brief raising a *Stern* objection.  The District Court denied the motion, finding it untimely, and affirmed the Bankruptcy Court's judgment.  As relevant here, the Seventh Circuit determined that Sharif's *Stern* objection could not be waived because it implicated structural interests and reversed on the alter- ego claim, holding that the Bankruptcy Court lacked constitutional authority to enter final judgment on that claim.

*Held*:

   1. Article III permits bankruptcy judges to adjudicate *Stern* claims with the parties' knowing and voluntary consent. Pp. 8–17.

   (a) The foundational case supporting the adjudication of legal disputes by non-Article III judges with the consent of the parties is *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833.  There, the Court held that the right to adjudication before an Article III

court is "personal" and therefore "subject to waiver." *Id.,* at 848. The Court also recognized that if Article III's structural interests as "'an inseparable element of the constitutional system of checks and balances'" are implicated, "the parties cannot by consent cure the constitutional difficulty." *Id.,* at 850–851. The importance of consent was reiterated in two later cases involving the Federal Magistrates Act's assignment of non-Article III magistrate judges to supervise *voir dire* in felony trials. In *Gomez* v. *United States*, 490 U. S. 858, the Court held that a magistrate judge was not permitted to select a jury without the defendant's consent, *id.,* at 864. But in *Peretz* v. *United States*, 501 U. S. 923, the Court stated that "the defendant's consent significantly changes the constitutional analysis," *id.*, at 932. Because an Article III court retained supervisory authority over the process, the Court found "no structural protections . . . implicated" and upheld the Magistrate Judge's action. *Id.,* at 937. Pp. 8–12.

(b) The question whether allowing bankruptcy courts to decide *Stern* claims by consent would "impermissibly threate[n] the institutional integrity of the Judicial Branch," *Schor*, 478 U. S., at 851, must be decided "with an eye to the practical effect that the" practice "will have on the constitutionally assigned role of the federal judiciary," *ibid.* For several reasons, this practice does not usurp the constitutional prerogatives of Article III courts. Bankruptcy judges are appointed and may be removed by Article III judges, see 28 U. S. C. §§152(a)(1), (e); "serve as judicial officers of the United States district court," §151; and collectively "constitute a unit of the district court" for the district in which they serve, §152(a)(1). Bankruptcy courts hear matters solely on a district court's reference, §157(a), and possess no free-floating authority to decide claims traditionally heard by Article III courts, see *Schor*, 478 U. S., at 854, 856. "[T]he decision to invoke" the bankruptcy court's authority "is left entirely to the parties," *id.,* at 855, and "the power of the federal judiciary to take jurisdiction" remains in place, *ibid.* Finally, there is no indication that Congress gave bankruptcy courts the ability to decide *Stern* claims in an effort to aggrandize itself or humble the Judiciary. See, *e.g., Peretz,* 501 U. S., at 937. Pp. 12–15.

(c) *Stern* does not compel a different result. It turned on the fact that the litigant "did not truly consent to" resolution of the claim against it in a non-Article III forum, 564 U. S., at ___, and thus, does not govern the question whether litigants may validly consent to adjudication by a bankruptcy court. Moreover, expanding *Stern* to hold that a litigant may not waive the right to an Article III court through consent would be inconsistent with that opinion's own description of its holding as "a 'narrow' one" that did "not change all that much" about the division of labor between district and bankruptcy courts.

Syllabus

*Id.*, at ___. Pp. 15–17.

　2. Consent to adjudication by a bankruptcy court need not be express, but must be knowing and voluntary. Neither the Constitution nor the relevant statute—which requires "the consent of all parties to the proceeding" to hear a *Stern* claim, §157(c)(2)—mandates express consent. Such a requirement would be in great tension with this Court's holding that substantially similar language in §636(c)—which authorizes magistrate judges to conduct proceedings "[u]pon consent of the parties"—permits waiver based on "actions rather than words," *Roell* v. *Withrow*, 538 U. S. 580, 589. *Roell*'s implied consent standard supplies the appropriate rule for bankruptcy court adjudications and makes clear that a litigant's consent—whether express or implied—must be knowing and voluntary. Pp. 18–19.

　3. The Seventh Circuit should decide on remand whether Sharif's actions evinced the requisite knowing and voluntary consent and whether Sharif forfeited his *Stern* argument below. P. 20.

727 F. 3d 751, reversed and remanded.

　SOTOMAYOR, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, BREYER, and KAGAN, JJ., joined, and in which ALITO, J., joined in part. ALITO, J., filed an opinion concurring in part and concurring in the judgment. ROBERTS, C. J., filed a dissenting opinion, in which SCALIA, J., joined, and in which THOMAS, J., joined as to Part I. THOMAS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 13–935

WELLNESS INTERNATIONAL NETWORK, LIMITED, ET AL, PETITIONERS *v.* RICHARD SHARIF

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[May 26, 2015]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

Article III, §1, of the Constitution provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." Congress has in turn established 94 District Courts and 13 Courts of Appeals, composed of judges who enjoy the protections of Article III: life tenure and pay that cannot be diminished. Because these protections help to ensure the integrity and independence of the Judiciary, "we have long recognized that, in general, Congress may not withdraw from" the Article III courts "any matter which, from its nature, is the subject of a suit at the common law, or in equity, or in admiralty." *Stern* v. *Marshall*, 564 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 18) (internal quotation marks omitted).

Congress has also authorized the appointment of bankruptcy and magistrate judges, who do not enjoy the protections of Article III, to assist Article III courts in their work. The number of magistrate and bankruptcy judgeships exceeds the number of circuit and district judge-

ships.[1]  And it is no exaggeration to say that without the distinguished service of these judicial colleagues, the work of the federal court system would grind nearly to a halt.[2]

Congress' efforts to align the responsibilities of non-Article III judges with the boundaries set by the Constitution have not always been successful.  In *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50 (1982) (plurality opinion), and more recently in *Stern*, this Court held that Congress violated Article III by authorizing bankruptcy judges to decide certain claims for which litigants are constitutionally entitled to an Article III adjudication.  This case presents the question whether Article III allows bankruptcy judges to adjudicate such claims with the parties' consent.  We hold that Article III is not violated when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge.

## I

### A

Before 1978, district courts typically delegated bankruptcy proceedings to "referees."  *Executive Benefits Ins.*

_____

[1] Congress has authorized 179 circuit judgeships and 677 district judgeships, a total of 856.  United States Courts, Status of Article III Judgeships, http://www.uscourts.gov/Statistics/JudicialBusiness/2014/status-article-iii-judgeships.aspx (all Internet materials as visited May 22, 2015, and available in Clerk of Court's case file).  The number of authorized magistrate and bankruptcy judgeships currently stands at 883: 534 full-time magistrate judgeships and 349 bankruptcy judgeships.  United States Courts, Appointments of Magistrate Judges, http://www.uscourts.gov/Statistics/JudicialBusiness/2014/appointments-magistrate-judges.aspx;  United States Courts, Status of Bankruptcy Judgeships, http://www.uscourts.gov/Statistics/JudicialBusiness/2014/status-bankruptcy-judgeships.aspx.

[2] Between October 1, 2013, and September 30, 2014, for example, litigants filed 963,739 cases in bankruptcy courts—more than double the total number filed in district and circuit courts.  United States Courts, Judicial Caseload Indicators, http://www.uscourts.gov/Statistics/JudicialBusiness/2014/judicial-caseload-indicators.aspx.

*Agency* v. *Arkison*, 573 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 4). Under the Bankruptcy Act of 1898, bankruptcy referees had "[s]ummary jurisdiction" over "claims involving 'property in the actual or constructive possession of the bankruptcy court'"—that is, over the apportionment of the bankruptcy estate among creditors. *Ibid.* (alteration omitted). They could preside over other proceedings— matters implicating the court's "plenary jurisdiction"—by consent. *Id.,* at \_\_\_ (slip op., at 5); see also *MacDonald* v. *Plymouth County Trust Co.*, 286 U. S. 263, 266–267 (1932).

In 1978, Congress enacted the Bankruptcy Reform Act, which repealed the 1898 Act and gave the newly created bankruptcy courts power "much broader than that exercised under the former referee system." *Northern Pipeline*, 458 U. S., at 54. The Act "[e]liminat[ed] the distinction between 'summary' and 'plenary' jurisdiction" and enabled bankruptcy courts to decide "all 'civil proceedings arising under title 11 [the Bankruptcy title] or arising in or related to cases under title 11.'" *Ibid.* (emphasis deleted). Congress thus vested bankruptcy judges with most of the "'powers of a court of equity, law, and admiralty,'" *id.,* at 55, without affording them the benefits of Article III. This Court therefore held parts of the system unconstitutional in *Northern Pipeline.*

Congress responded by enacting the Bankruptcy Amendments and Federal Judgeship Act of 1984. Under that Act, district courts have original jurisdiction over bankruptcy cases and related proceedings. 28 U. S. C. §§1334(a), (b). But "[e]ach district court may provide that any or all" bankruptcy cases and related proceedings "shall be referred to the bankruptcy judges for the district." §157(a). Bankruptcy judges are "judicial officers of the United States district court," appointed to 14-year terms by the courts of appeals, and subject to removal for cause. §§152(a)(1), (e). "The district court may withdraw"

a reference to the bankruptcy court "on its own motion or on timely motion of any party, for cause shown." §157(d).

When a district court refers a case to a bankruptcy judge, that judge's statutory authority depends on whether Congress has classified the matter as a "[c]ore proceedin[g]" or a "[n]on-core proceedin[g]," §§157(b)(2), (4)—much as the authority of bankruptcy referees, before the 1978 Act, depended on whether the proceeding was "summary" or "plenary." Congress identified as "[c]ore" a nonexclusive list of 16 types of proceedings, §157(b)(2), in which it thought bankruptcy courts could constitutionally enter judgment.[3] Congress gave bankruptcy courts the power to "hear and determine" core proceedings and to "enter appropriate orders and judgments," subject to appellate review by the district court. §157(b)(1); see §158. But it gave bankruptcy courts more limited author-ity in non-core proceedings: They may "hear and determine" such proceedings, and "enter appropriate orders and judgments," only "with the consent of all the parties to the proceeding." §157(c)(2). Absent consent, bankruptcy courts in non-core proceedings may only "submit proposed findings of fact and conclusions of law," which the district courts review *de novo*. §157(c)(1).

## B

Petitioner Wellness International Network is a manufacturer of health and nutrition products.[4] Wellness and respondent Sharif entered into a contract under which Sharif would distribute Wellness' products. The relationship quickly soured, and in 2005, Sharif sued Wellness in

---

[3] Congress appears to have drawn the term "core" from *Northern Pipeline*'s description of "the restructuring of debtor-creditor relations" as "the core of the federal bankruptcy power." *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.,* 458 U. S., 50, 71 (1982).

[4] Individual petitioners Ralph and Cathy Oats are Wellness' founders. This opinion refers to all petitioners collectively as "Wellness."

the United States District Court for the Northern District of Texas. Sharif repeatedly ignored Wellness' discovery requests and other litigation obligations, resulting in an entry of default judgment for Wellness. The District Court eventually sanctioned Sharif by awarding Wellness over $650,000 in attorney's fees. This case arises from Wellness' long-running—and so far unsuccessful—efforts to collect on that judgment.

In February 2009, Sharif filed for Chapter 7 bankruptcy in the Northern District of Illinois. The bankruptcy petition listed Wellness as a creditor. Wellness requested documents concerning Sharif's assets, which Sharif did not provide. Wellness later obtained a loan application Sharif had filed in 2002, listing more than $5 million in assets. When confronted, Sharif informed Wellness and the Chapter 7 trustee that he had lied on the loan application. The listed assets, Sharif claimed, were actually owned by the Soad Wattar Living Trust (Trust), an entity Sharif said he administered on behalf of his mother, and for the benefit of his sister. Wellness pressed Sharif for information on the Trust, but Sharif again failed to respond.

Wellness filed a five-count adversary complaint against Sharif in the Bankruptcy Court. See App. 5–22. Counts I–IV of the complaint objected to the discharge of Sharif's debts because, among other reasons, Sharif had concealed property by claiming that it was owned by the Trust. Count V of the complaint sought a declaratory judgment that the Trust was Sharif's alter ego and that its assets should therefore be treated as part of Sharif's bankruptcy estate. *Id.*, at 21. In his answer, Sharif admitted that the adversary proceeding was a "core proceeding" under 28 U. S. C. §157(b)—*i.e.,* a proceeding in which the Bankruptcy Court could enter final judgment subject to appeal. See §§157(b)(1), (2)(J); App. 24. Indeed, Sharif requested judgment in his favor on all counts of Wellness' complaint

and urged the Bankruptcy Court to "find that the Soad Wattar Living Trust is not property of the [bankruptcy] estate." *Id.,* at 44.

A familiar pattern of discovery evasion ensued. Wellness responded by filing a motion for sanctions, or, in the alternative, to compel discovery. Granting the motion to compel, the Bankruptcy Court warned Sharif that if he did not respond to Wellness' discovery requests a default judgment would be entered against him. Sharif eventually complied with some discovery obligations, but did not produce any documents related to the Trust.

In July 2010, the Bankruptcy Court issued a ruling finding that Sharif had violated the court's discovery order. See App. to Pet. for Cert. 92a–120a. It accordingly denied Sharif's request to discharge his debts and entered a default judgment against him in the adversary proceeding. And it declared, as requested by count V of Wellness' complaint, that the assets supposedly held by the Trust were in fact property of Sharif's bankruptcy estate because Sharif "treats [the Trust's] assets as his own property." *Id.,* at 119a.

Sharif appealed to the District Court. Six weeks before Sharif filed his opening brief in the District Court, this Court decided *Stern*. In *Stern*, the Court held that Article III prevents bankruptcy courts from entering final judgment on claims that seek only to "augment" the bankruptcy estate and would otherwise "exis[t] without regard to any bankruptcy proceeding." 564 U. S., at ___, ___ (slip op., at 27, 34). Sharif did not cite *Stern* in his opening brief. Rather, after the close of briefing, Sharif moved for leave to file a supplemental brief, arguing that in light of *In re Ortiz*, 665 F. 3d 906 (CA7 2011)—a recently issued decision interpreting *Stern*—"the bankruptcy court's order should only be treated as a report and recommendation." App. 145. The District Court denied Sharif's motion for supplemental briefing as untimely and affirmed the Bank-

ruptcy Court's judgment.

The Court of Appeals for the Seventh Circuit affirmed in part and reversed in part. 727 F. 3d 751 (2013). The Seventh Circuit acknowledged that ordinarily Sharif's *Stern* objection would "not [be] preserved because he waited too long to assert it." 727 F. 3d, at 767.[5] But the court determined that the ordinary rule did not apply because Sharif's argument concerned "the allocation of authority between bankruptcy courts and district courts" under Article III, and thus "implicate[d] structural interests." *Id.,* at 771. Based on those separation-of-powers considerations, the court held that "a litigant may not waive" a *Stern* objection. *Id.,* at 773. Turning to the merits of Sharif's contentions, the Seventh Circuit agreed with the Bankruptcy Court's resolution of counts I–IV of Wellness' adversary complaint. It further concluded, however, that count V of the complaint alleged a so-called "*Stern* claim," that is, "a claim designated for final adjudication in the bankruptcy court as a statutory matter, but prohibited from proceeding in that way as a constitutional matter." *Executive Benefits*, 573 U. S., at \_\_\_ (slip op., at 4). The Seventh Circuit therefore ruled that the Bankruptcy Court lacked constitutional authority to enter final judgment on count V.[6]

———————

[5] Although the Seventh Circuit referred to Sharif's failure to raise his *Stern* argument in a timely manner as a waiver, that court has since clarified that its decision rested on forfeiture. See *Peterson* v. *Somers Dublin Ltd.*, 729 F. 3d 741, 747 (2013) ("The issue in *Wellness International Network* was forfeiture rather than waiver").

[6] The Seventh Circuit concluded its opinion by considering the remedy for the Bankruptcy Court's purportedly unconstitutional issuance of a final judgment. The court determined that if count V of Wellness' complaint raised a core claim, the only statutorily authorized remedy would be for the District Court to withdraw the reference to the Bankruptcy Court and set a new discovery schedule. The Seventh Circuit's reasoning on this point was rejected by our decision last Term in *Executive Benefits*, which held that district courts may treat *Stern*

We granted certiorari, 573 U. S. ___ (2014), and now reverse the judgment of the Seventh Circuit.[7]

## II

Our precedents make clear that litigants may validly consent to adjudication by bankruptcy courts.

### A

Adjudication by consent is nothing new. Indeed, "[d]uring the early years of the Republic, federal courts, with the consent of the litigants, regularly referred adjudication of entire disputes to non-Article III referees, masters, or arbitrators, for entry of final judgment in accordance with the referee's report." Brubaker, The Constitutionality of Litigant Consent to Non-Article III Bankruptcy Adjudications, 32 Bkrtcy. L. Letter No. 12, p. 6 (Dec. 2012); see, *e.g., Thornton* v. *Carson*, 7 Cranch 596, 597 (1813) (affirming damages awards in two actions that "were referred, by consent under a rule of Court to arbitrators"); *Heckers* v. *Fowler*, 2 Wall. 123, 131 (1865) (observing that the "[p]ractice of referring pending actions under a rule of court, by consent of parties, was well known at common law," and "is now universally regarded . . . as the proper foundation of judgment"); *Newcomb* v. *Wood*, 97 U. S. 581, 583 (1878) (recognizing "[t]he power of a court of justice, with the consent of the parties, to appoint arbitrators and refer a case pending before it").

The foundational case in the modern era is *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833 (1986).

---

claims like non-core claims and thus are not required to restart proceedings entirely when a bankruptcy court improperly enters final judgment.

[7] Because the Court concludes that the Bankruptcy Court could validly enter judgment on Wellness' claim with the parties' consent, this opinion does not address, and expresses no view on, Wellness' alternative contention that the Seventh Circuit erred in concluding the claim in count V of its complaint was a *Stern* claim.

The Commodity Futures Trading Commission (CFTC), which Congress had authorized to hear customer complaints against commodities brokers, issued a regulation allowing itself to hear state-law counterclaims as well. William Schor filed a complaint with the CFTC against his broker, and the broker, which had previously filed claims against Schor in federal court, refiled them as counterclaims in the CFTC proceeding. The CFTC ruled against Schor on the counterclaims. This Court upheld that ruling against both statutory and constitutional challenges.

On the constitutional question (the one relevant here) the Court began by holding that Schor had "waived any right he may have possessed to the full trial of [the broker's] counterclaim before an Article III court." *Id.,* at 849. The Court then explained why this waiver legitimated the CFTC's exercise of authority: "[A]s a personal right, Article III's guarantee of an impartial and independent federal adjudication is subject to waiver, just as are other personal constitutional rights"—such as the right to a jury— "that dictate the procedures by which civil and criminal matters must be tried." *Id.,* at 848–849.

The Court went on to state that a litigant's waiver of his "personal right" to an Article III court is not always dispositive because Article III "not only preserves to litigants their interest in an impartial and independent federal adjudication of claims . . . , but also serves as 'an inseparable element of the constitutional system of checks and balances.' . . . To the extent that this structural principle is implicated in a given case"—but only to that extent— "the parties cannot by consent cure the constitutional difficulty . . . ." *Id.,* at 850–851.

Leaning heavily on the importance of Schor's consent, the Court found no structural concern implicated by the CFTC's adjudication of the counterclaims against him. While "Congress gave the CFTC the authority to adjudicate such matters," the Court wrote,

"the decision to invoke this forum is left entirely to the parties and the power of the federal judiciary to take jurisdiction of these matters is unaffected. In such circumstances, separation of powers concerns are diminished, for it seems self-evident that just as Congress may encourage parties to settle a dispute out of court or resort to arbitration without impermissible incursions on the separation of powers, Congress may make available a quasi-judicial mechanism through which willing parties may, at their option, elect to resolve their differences." *Id.,* at 855.

The option for parties to submit their disputes to a non-Article III adjudicator was at most a "*de minimis*" infringement on the prerogative of the federal courts. *Id.,* at 856.

A few years after *Schor*, the Court decided a pair of cases—*Gomez* v. *United States*, 490 U. S. 858 (1989), and *Peretz* v. *United States*, 501 U. S. 923 (1991)—that reiterated the importance of consent to the constitutional analysis. Both cases concerned whether the Federal Magistrates Act authorized magistrate judges to preside over jury selection in a felony trial;[8] the difference was that Peretz consented to the practice while Gomez did not. That difference was dispositive.

In *Gomez*, the Court interpreted the statute as not allowing magistrate judges to supervise *voir dire* without consent, emphasizing the constitutional concerns that might otherwise arise. See 490 U. S., at 864. In *Peretz*, the Court upheld the Magistrate Judge's action, stating that "the defendant's consent significantly changes the constitutional analysis." 501 U. S., at 932. The Court

---

[8] In relevant part, the Act provides that district courts may assign magistrate judges certain enumerated duties as well as "such additional duties as are not inconsistent with the Constitution and the laws of the United States." 28 U. S. C. §636(b)(3).

concluded that allowing a magistrate judge to supervise jury selection—with consent—does not violate Article III, explaining that "litigants may waive their personal right to have an Article III judge preside over a civil trial," *id.,* at 936 (citing *Schor*, 478 U. S., at 848), and that "[t]he most basic rights of criminal defendants are similarly subject to waiver," 501 U. S., at 936. And "[e]ven assuming that a litigant may not waive structural protections provided by Article III," the Court found "no such structural protections . . . implicated by" a magistrate judge's supervision of *voir dire*:

> "Magistrates are appointed and subject to removal by Article III judges. The 'ultimate decision' whether to invoke the magistrate's assistance is made by the district court, subject to veto by the parties. The decision whether to empanel the jury whose selection a magistrate has supervised also remains entirely with the district court. Because 'the entire process takes place under the district court's total control and jurisdiction,' there is no danger that use of the magistrate involves a 'congressional attemp[t] "to transfer jurisdiction [to non-Article III tribunals] for the purpose of emasculating" constitutional courts.'" *Id.,* at 937 (citations omitted; alteration in original).[9]

The lesson of *Schor*, *Peretz*, and the history that preceded them is plain: The entitlement to an Article III adjudicator is "a personal right" and thus ordinarily "subject to

---

[9] Discounting the relevance of *Gomez* and *Peretz*, the principal dissent emphasizes that neither case concerned the entry of final judgment by a non-Article III actor. See *post*, at 16 (opinion of ROBERTS, C. J.). Here again, the principal dissent's insistence on formalism leads it astray. As we explained in *Peretz*, the "responsibility and importance [of] presiding over *voir dire* at a felony trial" is equivalent to the "supervision of entire civil and misdemeanor trials," 501 U. S., at 933, tasks in which magistrate judges may "order the entry of judgment" with the parties' consent, §636(c)(1).

waiver," *Schor*, 478 U. S., at 848.  Article III also serves a structural purpose, "barring congressional attempts 'to transfer jurisdiction [to non-Article III tribunals] for the purpose of emasculating' constitutional courts and thereby prevent[ing] 'the encroachment or aggrandizement of one branch at the expense of the other.'" *Id.,* at 850 (citations omitted).  But allowing Article I adjudicators to decide claims submitted to them by consent does not offend the separation of powers so long as Article III courts retain supervisory authority over the process.

## B

The question here, then, is whether allowing bankruptcy courts to decide *Stern* claims by consent would "impermissibly threate[n] the institutional integrity of the Judicial Branch." *Schor*, 478 U. S., at 851.  And that question must be decided not by "formalistic and unbending rules," but "with an eye to the practical effect that the" practice "will have on the constitutionally assigned role of the federal judiciary." *Ibid.*; see *Thomas* v. *Union Carbide Agricultural Products Co.*, 473 U. S. 568, 587 (1985) ("[P]ractical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III").  The Court must weigh

> "the extent to which the essential attributes of judicial power are reserved to Article III courts, and, conversely, the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts, the origins and importance of the right to be adjudicated, and the concerns that drove Congress to depart from the requirements of Article III." *Schor*, 478 U. S., at 851 (internal quotation marks omitted).

Applying these factors, we conclude that allowing bankruptcy litigants to waive the right to Article III adjudica-

tion of *Stern* claims does not usurp the constitutional prerogatives of Article III courts. Bankruptcy judges, like magistrate judges, "are appointed and subject to removal by Article III judges," *Peretz*, 501 U. S., at 937; see 28 U. S. C. §§152(a)(1), (e). They "serve as judicial officers of the United States district court," §151, and collectively "constitute a unit of the district court" for that district, §152(a)(1). Just as "[t]he 'ultimate decision' whether to invoke [a] magistrate [judge]'s assistance is made by the district court," *Peretz*, 501 U. S., at 937, bankruptcy courts hear matters solely on a district court's reference, §157(a), which the district court may withdraw *sua sponte* or at the request of a party, §157(d). "[S]eparation of powers concerns are diminished" when, as here, "the decision to invoke [a non-Article III] forum is left entirely to the parties and the power of the federal judiciary to take jurisdiction" remains in place. *Schor*, 478 U. S., at 855.

Furthermore, like the CFTC in *Schor*, bankruptcy courts possess no free-floating authority to decide claims traditionally heard by Article III courts. Their ability to resolve such matters is limited to "a narrow class of common law claims as an incident to the [bankruptcy courts'] primary, and unchallenged, adjudicative function." *Id.,* at 854. "In such circumstances, the magnitude of any intrusion on the Judicial Branch can only be termed *de minimis.*" *Id.,* at 856.

Finally, there is no indication that Congress gave bankruptcy courts the ability to decide *Stern* claims in an effort to aggrandize itself or humble the Judiciary. As in *Peretz*, "[b]ecause 'the entire process takes place under the district court's total control and jurisdiction,' there is no danger that use of the [bankruptcy court] involves a 'congressional attemp[t] "to transfer jurisdiction [to non-Article III tribunals] for the purpose of emasculating" constitutional courts.'" 501 U. S*.,* at 937 (citation omitted); see also *Schor*, 478 U. S., at 855 (allowing CFTC's adjudication of

counterclaims because of "the degree of judicial control saved to the federal courts, as well as the congressional purpose behind the jurisdictional delegation, the demonstrated need for the delegation, and the limited nature of the delegation" (citation omitted)); *Pacemaker Diagnostic Clinic of America, Inc.* v. *Instromedix, Inc.*, 725 F. 2d 537, 544 (CA9 1984) (en banc) (Kennedy, J.) (magistrate judges may adjudicate civil cases by consent because the Federal Magistrates Act "invests the Article III judiciary with extensive administrative control over the management, composition, and operation of the magistrate system").[10]

Congress could choose to rest the full share of the Judiciary's labor on the shoulders of Article III judges. But doing so would require a substantial increase in the number of district judgeships. Instead, Congress has supplemented the capacity of district courts through the able

---

[10] The principal dissent accuses us of making Sharif's consent "'dispositive' in curing [a] structural separation of powers violation," contrary to the holding of *Schor*. *Post*, at 16. That argument misapprehends both *Schor* and the nature of our analysis. What *Schor* forbids is using consent to excuse an actual violation of Article III. See 478 U. S., at 850–851 ("*To the extent* that th[e] structural principle [protected by Article III] is implicated in a given case, the parties cannot by consent cure the constitutional difficulty . . ." (emphasis added)). But *Schor* confirms that consent remains highly relevant when determining, as we do here, whether a particular adjudication in fact raises constitutional concerns. See *id.,* at 855 ("separation of powers concerns are diminished" when "the decision to invoke [a non-Article III] forum is left entirely to the parties"). Thus, we do not rely on Sharif's consent to "cur[e]" a violation of Article III. His consent shows, in part, why no such violation has occurred. Cf. Meltzer, Legislative Courts, Legislative Power, and the Constitution, 65 Ind. L. J. 291, 303 (1990) ("[C]onsent provides, if not complete, at least very considerable reason to doubt that the tribunal poses a serious threat to the ideal of federal adjudicatory independence"); Fallon, Of Legislative Courts, Administrative Agencies, and Article III, 101 Harv. L. Rev. 915, 992 (1988) (when the parties consent, "there is substantial assurance that the agency is not generally behaving arbitrarily or otherwise offending separation-of-powers values. Judicial integrity is not at risk").

assistance of bankruptcy judges. So long as those judges are subject to control by the Article III courts, their work poses no threat to the separation of powers.

## C

Our recent decision in *Stern*, on which Sharif and the principal dissent rely heavily, does not compel a different result. That is because *Stern*—like its predecessor, *Northern Pipeline*—turned on the fact that the litigant "did not truly consent to" resolution of the claim against it in a non-Article III forum. 564 U. S., at ___ (slip op., at 27).

To understand *Stern*, it is necessary to first understand *Northern Pipeline*. There, the Court considered whether bankruptcy judges "could 'constitutionally be vested with jurisdiction to decide [a] state-law contract claim' against an entity that was not otherwise part of the bankruptcy proceedings." 564 U. S., at ___ (slip op., at 19). In answering that question in the negative, both the plurality and then-Justice Rehnquist, concurring in the judgment, noted that the entity in question did not consent to the bankruptcy court's adjudication of the claim. See 458 U. S., at 80, n. 31 (plurality opinion); *id.,* at 91 (opinion of Rehnquist, J.). The Court confirmed in two later cases that *Northern Pipeline* turned on the lack of consent. See *Schor*, 478 U. S., at 849 ("[I]n *Northern Pipeline*, . . . the absence of consent to an initial adjudication before a non-Article III tribunal was relied on as a significant factor in determining that Article III forbade such adjudication"); *Thomas*, 473 U. S., at 584.

*Stern* presented the same scenario. The majority cited the dissent's observation that *Northern Pipeline* "establish[ed] only that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, *without consent* of the litigants, and subject only to ordinary appellate review," 564 U. S.,

at ___ (slip op., at 28–29) (emphasis added; internal quotation marks omitted). To which the majority responded, "Just so: Substitute 'tort' for 'contract,' and that statement directly covers this case." *Id.,* at ___ (slip op., at 29); see also *id.,* at ___ (slip op., at 27) (defendant litigated in the Bankruptcy Court because he "had nowhere else to go" to pursue his claim). Because *Stern* was premised on nonconsent to adjudication by the Bankruptcy Court, the "constitutional bar" it announced, see *post*, at 14 (ROBERTS, C. J., dissenting), simply does not govern the question whether litigants may validly consent to adjudication by a bankruptcy court.

An expansive reading of *Stern*, moreover, would be inconsistent with the opinion's own description of its holding. The Court in *Stern* took pains to note that the question before it was "a 'narrow' one," and that its answer did "not change all that much" about the division of labor between district courts and bankruptcy courts. *Id.,* at ___ (slip op., at 37); see also *id.,* at ___ (slip op., at 38) (stating that Congress had exceeded the limitations of Article III "in one isolated respect"). That could not have been a fair characterization of the decision if it meant that bankruptcy judges could no longer exercise their longstanding authority to resolve claims submitted to them by consent. Interpreting *Stern* to bar consensual adjudications by bankruptcy courts would "meaningfully chang[e] the division of labor" in our judicial system, contra, *id.,* at ___ (slip op., at 37).[11]

_____

[11] In advancing its restrictive view of *Stern*, the principal dissent ignores the sweeping jurisprudential implications of its position. If, as the principal dissent suggests, consent is irrelevant to the Article III analysis, it is difficult to see how *Schor* and *Peretz* were not wrongly decided. But those decisions obviously remain good law. It is the principal dissent's position that breaks with our precedents. See *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 231 (1995) ("[T]he proposition that legal defenses based upon doctrines central to the courts' struc-

In sum, the cases in which this Court has found a violation of a litigant's right to an Article III decisionmaker have involved an objecting defendant forced to litigate involuntarily before a non-Article III court. The Court has never done what Sharif and the principal dissent would have us do—hold that a litigant who has the right to an Article III court may not waive that right through his consent.

## D

The principal dissent warns darkly of the consequences of today's decision. See *post*, at 17–20. To hear the principal dissent tell it, the world will end not in fire, or ice, but in a bankruptcy court. The response to these ominous predictions is the same now as it was when Justice Brennan, dissenting in *Schor*, first made them nearly 30 years ago:

> "This is not to say, of course, that if Congress created a phalanx of non-Article III tribunals equipped to handle the entire business of the Article III courts without any Article III supervision or control and without evidence of valid and specific legislative necessities, the fact that the parties had the election to proceed in their forum of choice would necessarily save the scheme from constitutional attack. But this case obviously bears no resemblance to such a scenario . . . ." 478 U. S., at 855 (citations omitted).

Adjudication based on litigant consent has been a consistent feature of the federal court system since its inception. Reaffirming that unremarkable fact, we are confident, poses no great threat to anyone's birthrights, constitutional or otherwise.

———————

tural independence can never be waived simply does not accord with our cases").

### III

Sharif contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be express. We disagree.

Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express. Nor does the relevant statute, 28 U. S. C. §157, mandate express consent; it states only that a bankruptcy court must obtain "the consent"—consent *simpliciter*—"of all parties to the proceeding" before hearing and determining a non-core claim. §157(c)(2). And a requirement of express consent would be in great tension with our decision in *Roell* v. *Withrow*, 538 U. S. 580 (2003). That case concerned the interpretation of §636(c), which authorizes magistrate judges to "conduct any or all proceedings in a jury or non-jury civil matter and order the entry of judgment in the case," with "the consent of the parties."[12] The specific question in *Roell* was whether, as a statutory matter, the "consent" required by §636(c) had to be express. The dissent argued that "[r]eading §636(c)(1) to require express consent not only is more consistent with the text of

———————

[12] Consistent with our precedents, the Courts of Appeals have unanimously upheld the constitutionality of §636(c). See *Sinclair* v. *Wainwright*, 814 F. 2d 1516, 1519 (CA11 1987); *Bell & Beckwith* v. *United States*, 766 F. 2d 910, 912 (CA6 1985); *Gairola* v. *Virginia Dept. of Gen. Servs.*, 753 F. 2d 1281, 1285 (CA4 1985); *D. L. Auld Co.* v. *Chroma Graphics Corp.*, 753 F. 2d 1029, 1032 (CA Fed. 1985); *United States* v. *Dobey*, 751 F. 2d 1140, 1143 (CA10 1985); *Fields* v. *Washington Metropolitan Area Transit Auth.*, 743 F. 2d 890, 893 (CADC 1984); *Geras* v. *Lafayette Display Fixtures, Inc.*, 742 F. 2d 1037, 1045 (CA7 1984); *Lehman Bros. Kuhn Loeb Inc.* v. *Clark Oil & Refining Corp.*, 739 F. 2d 1313, 1316 (CA8 1984) (en banc); *Puryear* v. *Ede's Ltd.*, 731 F. 2d 1153, 1154 (CA5 1984); *Goldstein* v. *Kelleher*, 728 F. 2d 32, 36 (CA1 1984); *Collins* v. *Foreman*, 729 F. 2d 108, 115–116 (CA2 1984); *Pacemaker Diagnostic Clinic, Inc.* v. *Instromedix, Inc.*, 725 F. 2d 537, 540 (CA9 1984) (en banc) (Kennedy, J.); *Wharton-Thomas* v. *United States*, 721 F. 2d 922, 929–930 (CA3 1983).

the statute, but also" avoids constitutional concerns by "ensur[ing] that the parties knowingly and voluntarily waive their right to an Article III judge." 538 U. S., at 595 (opinion of THOMAS, J.). But the majority—thus placed on notice of the constitutional concern—was untroubled by it, opining that "the Article III right is substantially honored" by permitting waiver based on "actions rather than words." *Id.,* at 589, 590.

The implied consent standard articulated in *Roell* supplies the appropriate rule for adjudications by bankruptcy courts under §157. Applied in the bankruptcy context, that standard possesses the same pragmatic virtues— increasing judicial efficiency and checking gamesmanship—that motivated our adoption of it for consent-based adjudications by magistrate judges. See *id.,* at 590. It bears emphasizing, however, that a litigant's consent— whether express or implied—must still be knowing and voluntary. *Roell* makes clear that the key inquiry is whether "the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case" before the non-Article III adjudicator. *Ibid.*; see also *id.,* at 588, n. 5 ("notification of the right to refuse" adjudication by a non-Article III court "is a prerequisite to any inference of consent").[13]

––––––––––

[13] Even though the Constitution does not require that consent be express, it is good practice for courts to seek express statements of consent or nonconsent, both to ensure irrefutably that any waiver of the right to Article III adjudication is knowing and voluntary and to limit subsequent litigation over the consent issue. Statutes or judicial rules may require express consent where the Constitution does not. Indeed, the Federal Rules of Bankruptcy Procedure already require that pleadings in adversary proceedings before a bankruptcy court "contain a statement that the proceeding is core or non-core and, if non-core, that the pleader does or does not consent to entry of final orders or judgment by the bankruptcy judge." Fed. Rule Bkrtcy. Proc. 7008 (opening pleadings); see Fed. Rule Bkrtcy. Proc. 7012 (responsive pleadings). The Bankruptcy Court and the parties followed that

### IV

It would be possible to resolve this case by determining whether Sharif in fact consented to the Bankruptcy Court's adjudication of count V of Wellness' adversary complaint. But reaching that determination would require a deeply factbound analysis of the procedural history unique to this protracted litigation. Our resolution of the consent question—unlike the antecedent constitutional question—would provide little guidance to litigants or the lower courts. Thus, consistent with our role as "a court of review, not of first view," *Nautilus, Inc.* v. *Biosig Instruments, Inc.*, 572 U. S. ___, ___ (2014) (slip op., at 14) (internal quotation marks omitted), we leave it to the Seventh Circuit to decide on remand whether Sharif's actions evinced the requisite knowing and voluntary consent, and also whether, as Wellness contends, Sharif forfeited his *Stern* argument below.

\*    \*    \*

The Court holds that Article III permits bankruptcy courts to decide *Stern* claims submitted to them by consent. The judgment of the United States Court of Appeals for the Seventh Circuit is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

———————

procedure in this case. See App. 6, 24; *supra*, at 5–6. And this Court recently submitted to Congress, pursuant to the Rules Enabling Act, proposed amendments to Rules 7008 and 7012 that remove references to the core/non-core distinction and thus require parties in all bankruptcy proceedings to state expressly whether they consent to the bankruptcy court's entry of judgment. Report of the Judicial Conference, Committee on Rules of Practice and Procedure, pp. 6, 7, 9. (Sept. 2013).

# SUPREME COURT OF THE UNITED STATES

———

No. 13–935

———

## WELLNESS INTERNATIONAL NETWORK, LIMITED, ET AL, PETITIONERS *v.* RICHARD SHARIF

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[May 26, 2015]

JUSTICE ALITO, concurring in part and concurring in the judgment.

I join the opinion of the Court insofar as it holds that a bankruptcy judge's resolution of a "*Stern* claim"* with the consent of the parties does not violate Article III of the Constitution. The Court faithfully applies *Commodity Futures Trading Comm'n* v. *Schor,* 478 U. S. 833 (1986). No one believes that an arbitrator exercises "[t]he judicial Power of the United States," Art. III, §1, in an ordinary, run-of-the mill arbitration. And whatever differences there may be between an arbitrator's "decision" and a bankruptcy court's "judgment," those differences would seem to fall within the Court's previous rejection of "formalistic and unbending rules." *Schor*, *supra*, at 851. Whatever one thinks of *Schor*, it is still the law of this Court, and the parties do not ask us to revisit it.

Unlike the Court, however, I would not decide whether consent may be implied. While the Bankruptcy Act just speaks of "consent," 28 U. S. C. §157(c)(2), the Federal Rules of Bankruptcy Procedure provide that "[i]n non-core proceedings final orders and judgments shall not be en-

———

*See *Stern* v. *Marshall*, 564 U. S. ___ (2011). A "*Stern* claim" is a claim that is "core" under the statute but yet "prohibited from proceeding in that way as a constitutional matter." *Executive Benefits Ins. Agency* v. *Arkison*, 573 U. S. ___, ___ (2014) (slip op., at 4).

tered on the bankruptcy judge's order except with the express consent of the parties," Rule 7012(b). When this Rule was promulgated, no one was thinking about a *Stern* claim. But now, assuming that Rule 7012(b) represents a permissible interpretation of §157, the question arises whether a *Stern* claim should be treated as a non-core or core claim for purposes of the bankruptcy rules. See *Executive Benefits Ins. Agency* v. *Arkison*, 573 U. S. ___, ___– ___ (2014) (slip op., at 9–10) (holding that, for reasons of severability, a bankruptcy court should treat a *Stern* claim as a non-core claim).

There is no need to decide that question here. In this case, respondent forfeited any *Stern* objection by failing to present that argument properly in the courts below. *Stern* vindicates Article III, but that does not mean that *Stern* arguments are exempt from ordinary principles of appellate procedure. See *B&B Hardware, Inc.* v. *Hargis Industries, Inc.*, *ante,* at 11.

# SUPREME COURT OF THE UNITED STATES

———————

No. 13–935

———————

## WELLNESS INTERNATIONAL NETWORK, LIMITED, ET AL, PETITIONERS *v.* RICHARD SHARIF

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[May 26, 2015]

CHIEF JUSTICE ROBERTS, with whom JUSTICE SCALIA joins, and with whom JUSTICE THOMAS joins as to Part I, dissenting.

The Bankruptcy Court in this case granted judgment to Wellness on its claim that Sharif's bankruptcy estate contained assets he purportedly held in a trust. Provided that no third party asserted a substantial adverse claim to those assets, the Bankruptcy Court's adjudication "stems from the bankruptcy itself" rather than from "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *Stern* v. *Marshall*, 564 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 18, 34) (internal quotation marks omitted). Article III poses no barrier to such a decision. That is enough to resolve this case.

Unfortunately, the Court brushes aside this narrow basis for decision and proceeds to the serious constitutional question whether private parties may consent to an Article III violation. In my view, they cannot. By reserving the judicial power to judges with life tenure and salary protection, Article III constitutes "an inseparable element of the constitutional system of checks and balances"—a structural safeguard that must "be jealously guarded." *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 58, 60 (1982) (plurality opinion).

Today the Court lets down its guard. Despite our prece-

dent directing that "parties cannot by consent cure" an Article III violation implicating the structural separation of powers, *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833, 850–851 (1986), the majority authorizes litigants to do just that. The Court justifies its decision largely on pragmatic grounds. I would not yield so fully to functionalism. The Framers adopted the formal protections of Article III for good reasons, and "the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution." *INS* v. *Chadha*, 462 U. S. 919, 944 (1983).

The impact of today's decision may seem limited, but the Court's acceptance of an Article III violation is not likely to go unnoticed. The next time Congress takes judicial power from Article III courts, the encroachment may not be so modest—and we will no longer hold the high ground of principle. The majority's acquiescence in the erosion of our constitutional power sets a precedent that I fear we will regret. I respectfully dissent.

I

The Court granted certiorari on two questions in this case. The first is whether the Bankruptcy Court's entry of final judgment on Wellness's claim violated Article III based on *Stern*. The second is whether an Article III violation of the kind recognized in *Stern* can be cured by consent. Because the first question can be resolved on narrower grounds, I would answer it alone.

A

The Framers of the Constitution "lived among the ruins of a system of intermingled legislative and judicial powers." *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 219 (1995). Under British rule, the King "made Judges dependent on his Will alone, for the tenure of their offices,

and the amount and payment of their salaries." The Declaration of Independence ¶11. Between the Revolution and the Constitutional Convention, state legislatures routinely interfered with judgments of the courts. This history created the "sense of a sharp necessity to separate the legislative from the judicial power." *Plaut*, 514 U. S., at 221; see *Perez* v. *Mortgage Bankers Assn.*, 575 U. S. \_\_\_, \_\_\_–\_\_\_ (2015) (THOMAS, J., concurring in judgment) (slip op., at 5–8). The result was Article III, which established a judiciary "truly distinct from both the legislature and the executive." The Federalist No. 78, p. 466 (C. Rossiter ed. 1961) (A. Hamilton).

Article III vests the "judicial Power of the United States" in "one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." Art. III, §1. The judges of those courts are entitled to hold their offices "during good Behaviour" and to receive compensation "which shall not be diminished" during their tenure. *Ibid.* The judicial power extends "to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties" and to other enumerated matters. Art. III, §2. Taken together, these provisions define the constitutional birthright of Article III judges: to "render dispositive judgments" in cases or controversies within the bounds of federal jurisdiction. *Plaut*, 514 U. S., at 219 (internal quotation marks omitted).

With narrow exceptions, Congress may not confer power to decide federal cases and controversies upon judges who do not comply with the structural safeguards of Article III. Those narrow exceptions permit Congress to establish non-Article III courts to exercise general jurisdiction in the territories and the District of Columbia, to serve as military tribunals, and to adjudicate disputes over "public rights" such as veterans' benefits. *Northern Pipeline*, 458 U. S., at 64–70 (plurality opinion).

Our precedents have also recognized an exception to the

requirements of Article III for certain bankruptcy proceedings. When the Framers gathered to draft the Constitution, English statutes had long empowered nonjudicial bankruptcy "commissioners" to collect a debtor's property, resolve claims by creditors, order the distribution of assets in the estate, and ultimately discharge the debts. See 2 W. Blackstone, Commentaries *471–488. This historical practice, combined with Congress's constitutional authority to enact bankruptcy laws, confirms that Congress may assign to non-Article III courts adjudications involving "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power." *Northern Pipeline*, 458 U. S., at 71 (plurality opinion).

Although Congress may assign some bankruptcy proceedings to non-Article III courts, there are limits on that power. In *Northern Pipeline*, the Court invalidated statutory provisions that permitted a bankruptcy court to enter final judgment on a creditor's state law claim for breach of contract. Because that claim arose not from the bankruptcy but from independent common law sources, a majority of the Court determined that Article III required an adjudicator with life tenure and salary protection. See *id.*, at 84; *id.*, at 90–91 (Rehnquist, J., concurring in judgment).

Congress responded to *Northern Pipeline* by allowing bankruptcy courts to render final judgments only in "core" bankruptcy proceedings. 28 U. S. C. §157(b). Those judgments may be appealed to district courts and reviewed under deferential standards. §158(a). In non-core proceedings, bankruptcy judges may submit proposed findings of fact and conclusions of law, which the district court must review *de novo* before entering final judgment. §157(c)(1).

In *Stern*, we faced the question whether a bankruptcy court could enter final judgment on an action defined by Congress as a "core" proceeding—an estate's counterclaim against a creditor based on state tort law. §157(b)(2)(C).

We said no. Because the tort claim neither "stem[med] from the bankruptcy itself" nor would "necessarily be resolved in the claims allowance process," it fell outside the recognized exceptions to Article III. 564 U. S., at \_\_\_ (slip op., at 34). Like the contract claim in *Northern Pipeline*, the tort claim in *Stern* involved "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *Id.*, at \_\_\_ (slip op., at 18) (quoting *Northern Pipeline*, 458 U. S., at 90 (Rehnquist, J., concurring in judgment)). Congress had no power under the Constitution to assign the resolution of such a claim to a judge who lacked the structural protections of Article III.

## B

The question here is whether the claim Wellness submitted to the Bankruptcy Court is a "*Stern* claim" that requires final adjudication by an Article III court. See *Executive Benefits Ins. Agency* v. *Arkison*, 573 U. S. \_\_\_, \_\_\_–\_\_\_ (2014) (slip op., at 8–9) (assuming without deciding that a fraudulent conveyance action is a "*Stern* claim"). As the Court recounts, Wellness alleged that Sharif had concealed about $5 million of assets by claiming that they were owned by a trust. Wellness sought a declaratory judgment that the trust was in fact Sharif's alter ego and that its assets should accordingly be part of his bankruptcy estate. The Bankruptcy Court granted final judgment (based on Sharif's default) to Wellness, declaring that the trust assets were part of Sharif's estate because he had treated them as his own property. *Ante*, at 5–6.

In my view, Article III likely poses no barrier to the Bankruptcy Court's resolution of Wellness's claim. At its most basic level, bankruptcy is "an adjudication of interests claimed in a *res*." *Katchen* v. *Landy*, 382 U. S. 323, 329 (1966) (internal quotation marks omitted). Wellness asked the Bankruptcy Court to declare that assets held by Sharif are part of that res. Defining what constitutes the

estate is the necessary starting point of every bankruptcy; a court cannot divide up the estate without first knowing what's in it. See 11 U. S. C. §541(a). As the Solicitor General explains, "Identifying the property of the estate is therefore inescapably central to the restructuring of the debtor-creditor relationship." Brief for United States as *Amicus Curiae* 14.

Identifying property that constitutes the estate has long been a central feature of bankruptcy adjudication. English bankruptcy commissioners had authority not only to collect property in the debtor's possession, but also to "cause any house or tenement of the bankrupt to be broken open," in order to uncover and seize property the debtor had concealed. 2 W. Blackstone, Commentaries *485. America's first bankruptcy statute, enacted by Congress in 1800, similarly gave commissioners "power to take into their possession, all the estate, real and personal, of every nature and description to which the [debtor] may be entitled, either in law or equity, in any manner whatsoever." §5, 2 Stat. 23. That is peculiarly a bankruptcy power.

The Bankruptcy Act of 1898 provides further support for Wellness's position. Under that Act, bankruptcy referees had authority to exercise "summary" jurisdiction over certain claims, while other claims could only be adjudicated in "plenary" proceedings before an Article III district court. See *Arkison*, 573 U. S., at ___–___ (slip op., at 4–5). This Court interpreted the 1898 Act to permit bankruptcy referees to exercise summary jurisdiction to determine whether property in the actual or constructive possession of a debtor should come within the estate, at least when no third party asserted more than a "merely colorable" claim to the property. *Mueller* v. *Nugent*, 184 U. S. 1, 15 (1902). In the legal parlance of the times, a "merely colorable" claim was one that existed "in appearance only, and not in reality." Black's Law Dictionary 223 (1891). So a bank-

ruptcy referee could exercise summary jurisdiction over property in the debtor's possession as long as no third party asserted a "substantial adverse" claim. *Taubel-Scott-Kitzmiller Co.* v. *Fox*, 264 U. S. 426, 431–433 (1924).

Here, Sharif does not contest that he held legal title to the assets in the trust. Assuming that no third party asserted a substantial adverse claim to those assets—an inquiry for the Bankruptcy Court on remand—Wellness's alter ego claim fits comfortably into the category of cases that bankruptcy referees could have decided by themselves under the 1898 Act.

In *Mueller*, for example, this Court held that a bankruptcy referee could exercise summary jurisdiction over property in the possession of a third party acting as the debtor's agent. 184 U. S., at 14–17; see Black's Law Dictionary 302 (10th ed. 2014) (example of a merely "colorable" claim is "one made by a person holding property as an agent or bailee of the bankrupt"). Similarly, this Court held that a bankruptcy referee could exercise summary jurisdiction over a creditor's claim that the debtor had concealed assets under the veil of a corporate entity that was "nothing but a sham and a cloak." *Sampsell* v. *Imperial Paper & Color Corp.*, 313 U. S. 215, 216–217 (1941) (internal quotation marks omitted), rev'g 114 F. 2d 49, 52 (CA9 1940) (describing creditor's claim that corporation was debtor's "alter ego"). As the Court explained in *Sampsell*, the "legal existence of the affiliated corporation" did not automatically require a plenary proceeding, because "[m]ere legal paraphernalia will not suffice to transform into a substantial adverse claimant a corporation whose affairs are so closely assimilated to the affairs of the dominant stockholder that in substance it is little more than his corporate pocket." 313 U. S., at 218. Just as the bankruptcy referee in that case had authority to decide whether assets allegedly concealed behind the corporate veil belonged to the bankruptcy estate, the Bankruptcy

Court here had authority to decide whether the assets allegedly concealed in the trust belonged to Sharif's estate.

Sharif contends that Wellness's alter ego claim is more like an allegation of a fraudulent conveyance, which this Court has implied must be adjudicated by an Article III court. See *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33, 56 (1989); *Arkison*, 573 U. S., at ___–___ (slip op., at 8–9). Although both actions aim to remedy a debtor's deception, they differ in a critical respect. A fraudulent conveyance claim seeks assets in the hands of a third party, while an alter ego claim targets only the debtor's "second self." Webster's New International Dictionary 76 (2d ed. 1954). That distinction is significant given bankruptcy's historic domain over property within the actual or constructive "possession [of] the bankrupt at the time of the filing of the petition." *Thompson* v. *Magnolia Petroleum Co.*, 309 U. S. 478, 481 (1940). Through a fraudulent conveyance, a dishonest debtor *relinquishes* possession of assets before filing for bankruptcy. Reclaiming those assets for the estate requires depriving third parties of property within their otherwise lawful possession and control, an action that "quintessentially" required a suit at common law. *Granfinanciera*, 492 U. S., at 56. By contrast, a debtor's possession of property provided "an adequate basis" for a bankruptcy referee to adjudicate a dispute over title in a summary proceeding. *Thompson*, 309 U. S., at 482; see *Mueller*, 184 U. S., at 15–16 (distinguishing claim to property in possession of debtor's agent from fraudulent conveyance claim in determining that bankruptcy referee could exercise summary jurisdiction).

In sum, unlike the fraudulent conveyance claim in *Granfinanciera*, Wellness's alter ego claim alleges that assets within Sharif's actual or constructive possession belong to his estate. And unlike the breach of contract and tort claims at issue in *Northern Pipeline* and *Stern*,

Wellness's claim stems not from any independent source of law but "from the bankruptcy itself." *Stern*, 564 U. S., at \_\_\_ (slip op., at 34). Provided that no third party asserted a substantial adverse claim to the trust assets, Wellness's claim therefore falls within the narrow historical exception that permits a non-Article III adjudicator in certain bankruptcy proceedings. I would reverse the contrary holding by the Court of Appeals and end our inquiry there, rather than deciding a broader question that may not be necessary to the disposition of this case.

## II

The Court "expresses no view" on whether Wellness's claim was a *Stern* claim. *Ante*, at 8, n. 7. Instead, the Court concludes that the Bankruptcy Court had constitutional authority to enter final judgment on Wellness's claim either way. The majority rests its decision on Sharif's purported consent to the Bankruptcy Court's adjudication. But Sharif has no authority to compromise the structural separation of powers or agree to an exercise of judicial power outside Article III. His consent therefore cannot cure a constitutional violation.

### A

"[I]f there is a principle in our Constitution . . . more sacred than another," James Madison said on the floor of the First Congress, "it is that which separates the Legislative, Executive, and Judicial powers." 1 Annals of Cong. 581 (1789). A strong word, "sacred." Madison was the principal drafter of the Constitution, and he knew what he was talking about. By diffusing federal powers among three different branches, and by protecting each branch against incursions from the others, the Framers devised a structure of government that promotes both liberty and accountability. See *Bond* v. *United States*, 564 U. S. \_\_\_, \_\_\_–\_\_\_ (2011) (slip op., at 10–11); *Free Enterprise Fund* v.

*Public Company Accounting Oversight Bd.*, 561 U. S. 477, 497–501 (2010) (*PCAOB*); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 635 (1952) (Jackson, J., concurring).

Preserving the separation of powers is one of this Court's most weighty responsibilities. In performing that duty, we have not hesitated to enforce the Constitution's mandate "that one branch of the Government may not intrude upon the central prerogatives of another." *Loving* v. *United States*, 517 U. S. 748, 757 (1996). We have accordingly invalidated executive actions that encroach upon the power of the Legislature, see *NLRB* v. *Noel Canning*, 573 U. S. ___ (2014); *Youngstown*, 343 U. S. 579; legislative actions that invade the province of the Executive, see *PCAOB*, 561 U. S. 477; *Bowsher* v. *Synar*, 478 U. S. 714 (1986); *Chadha*, 462 U. S. 919; *Myers* v. *United States*, 272 U. S. 52 (1926); and actions by either branch that trench upon the territory of the Judiciary, see *Stern*, 564 U. S. ___; *Plaut*, 514 U. S. 211; *United States* v. *Will*, 449 U. S. 200 (1980); *United States* v. *Klein*, 13 Wall. 128 (1872); *Hayburn's Case*, 2 Dall. 409 (1792).

In these and other cases, we have emphasized that the values of liberty and accountability protected by the separation of powers belong not to any branch of the Government but to the Nation as a whole. See *Bowsher*, 478 U. S., at 722. A branch's consent to a diminution of its constitutional powers therefore does not mitigate the harm or cure the wrong. "Liberty is always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton* v. *City of New York*, 524 U. S. 417, 450 (1998) (KENNEDY, J., concurring). When the Executive and the Legislature agreed to bypass the Article I, §7, requirements of bicameralism and presentment by creating a Presidential line-item veto—a very pragmatic proposal—the Court held that the arrangement violated the Constitution notwithstanding the voluntary participa-

tion of both branches. *Id.*, at 421 (majority opinion). Likewise, the Court struck down a one-House "legislative veto" that violated Article I, §7, even though Presidents and Congresses had agreed to include similar provisions in hundreds of laws for more than 50 years. *Chadha*, 462 U. S., at 944–945.

In neither of these cases did the branches' willing embrace of a separation of powers violation weaken the Court's scrutiny. To the contrary, the branches' "enthusiasm" for the offending arrangements "'sharpened rather than blunted' our review." *Noel Canning*, 573 U. S., at ___ (SCALIA, J., concurring in judgment) (slip op., at 4) (quoting *Chadha*, 462 U. S, at 944). In short, because the structural provisions of the Constitution protect liberty and not just government entities, "the separation of powers does not depend on . . . whether 'the encroached-upon branch approves the encroachment.'" *PCAOB*, 561 U. S., at 497 (quoting *New York* v. *United States*, 505 U. S. 144, 182 (1992)).

### B

If a branch of the Federal Government may not consent to a violation of the separation of powers, surely a private litigant may not do so. Just as a branch of Government may not consent away the individual liberty interest protected by the separation of powers, so too an individual may not consent away the institutional interest protected by the separation of powers. To be sure, a private litigant may consensually relinquish *individual* constitutional rights. A federal criminal defendant, for example, may knowingly and voluntarily waive his Sixth Amendment right to a jury trial by pleading guilty to a charged offense. See *Brady* v. *United States*, 397 U. S. 742, 748 (1970). But that same defendant may not agree to stand trial on federal charges before a state court, a foreign court, or a moot court, because those courts have no constitutional author-

ity to exercise judicial power over his case, and he has no power to confer it. A "lack of federal jurisdiction cannot be waived or be overcome by an agreement of the parties." *Mitchell* v. *Maurer*, 293 U. S. 237, 244 (1934).

As the majority recognizes, the Court's most extensive discussion of litigant consent in a separation of powers case occurred in *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833 (1986). There the Court held that Article III confers both a "personal right" that can be waived through consent and a structural component that "safeguards the role of the Judicial Branch in our tripartite system." *Id.*, at 848, 850. "To the extent that this structural principle is implicated in a given case, the parties cannot by consent cure the constitutional difficulty for the same reason that the parties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III." *Id.*, at 850–851. Thus, when "Article III limitations are at issue, notions of consent and waiver cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect." *Id.*, at 851.

*Schor*'s holding that a private litigant can consent to an Article III violation that affects only his "personal right" has been vigorously contested. See *id.*, at 867 (Brennan, J., dissenting) ("Because the individual and structural interests served by Article III are coextensive, I do not believe that a litigant may ever waive his right to an Article III tribunal where one is constitutionally required"); *Granfinanciera*, 492 U. S., at 70 (SCALIA, J., concurring in part and concurring in judgment). But whatever the merits of that position, nobody disputes that *Schor* forbids a litigant from consenting to a constitutional violation when the structural component of Article III "is implicated." 478 U. S., at 850–851. Thus, the key inquiry in this case—as the majority puts it—is "whether allowing bankruptcy courts to decide *Stern* claims by consent would

'impermissibly threaten the institutional integrity of the Judicial Branch.'" *Ante*, at 12 (quoting *Schor*, 478 U. S., at 851; alteration omitted).

One need not search far to find the answer. In *Stern*, this Court applied the analysis from *Schor* to bankruptcy courts and concluded that they lack Article III authority to enter final judgments on matters now known as *Stern* claims. The Court noted that bankruptcy courts, unlike the administrative agency in *Schor*, were endowed by Congress with "substantive jurisdiction reaching any area of the *corpus juris*," power to render final judgments enforceable without any action by Article III courts, and authority to adjudicate counterclaims entirely independent of the bankruptcy itself. 564 U. S., at ___–___ (slip op., at 25–29). The Court concluded that allowing Congress to bestow such authority on non-Article III courts would "compromise the integrity of the system of separated powers and the role of the Judiciary in that system." *Id.*, at ___ (slip op., at 38). If there was any room for doubt about the basis for its holding, the Court dispelled it by asking a question: "Is there really a threat to the separation of powers where Congress has conferred the judicial power outside Article III only over certain counterclaims in bankruptcy?" *Id.*, at ___ (slip op., at 37). "The short but emphatic answer is yes." *Ibid.*

In other words, allowing bankruptcy courts to decide *Stern* claims by consent would "impermissibly threaten the institutional integrity of the Judicial Branch." *Ante*, at 12 (internal quotation marks and alteration omitted). It is little wonder that the Court of Appeals felt itself bound by *Stern* and *Schor* to hold that Sharif's consent could not cure the *Stern* violation. 727 F. 3d 751, 771 (CA7 2013). Other Courts of Appeals have adopted the same reading. See *In re BP RE, L. P.*, 735 F. 3d 279, 287 (CA5 2013); *Waldman* v. *Stone*, 698 F. 3d 910, 917–918 (CA6 2012).

The majority attempts to avoid this conclusion through

an imaginative reconstruction of *Stern*. As the majority sees it, *Stern* "turned on the fact that the litigant 'did not truly consent to' resolution of the claim" against him in the Bankruptcy Court. *Ante*, at 15 (quoting 564 U. S., at ___ (slip op., at 27)). That is not a proper reading of the decision. The constitutional analysis in *Stern*, spanning 22 pages, contained exactly one affirmative reference to the lack of consent. See *ibid.* That reference came amid a long list of factors distinguishing the proceeding in *Stern* from the proceedings in *Schor* and other "public rights" cases. 564 U. S., at ___–___ (slip op., at 27–29). *Stern*'s subsequent sentences made clear that the notions of consent relied upon by the Court in *Schor* did not apply in bankruptcy because "creditors lack an alternative forum to the bankruptcy court in which to pursue their claims." 564 U. S., at ___ (slip op., at 28) (quoting *Granfinanciera*, 492 U. S., at 59, n. 14). Put simply, the litigant in *Stern* did not consent because he *could not* consent given the nature of bankruptcy.

There was an opinion in *Stern* that turned heavily on consent: the dissent. 564 U. S., at ___–___ (opinion of BREYER, J.) (slip op., at 12–14). The *Stern* majority responded to the dissent with a counterfactual: *Even if* consent were relevant to the analysis, that factor would not change the result because the litigant did not truly consent. *Id.*, at ___–___ (slip op., at 28–29). Moreover, *Stern* held that "it does not matter who" authorizes a bankruptcy judge to render final judgments on *Stern* claims, because the "constitutional bar remains." *Id.*, at ___ (slip op., at 36). That holding is incompatible with the majority's conclusion today that two litigants can authorize a bankruptcy judge to render final judgments on *Stern* claims, despite the constitutional bar that remains.

The majority also relies heavily on the supervision and control that Article III courts exercise over bankruptcy courts. *Ante*, at 12–15. As the majority notes, court of

appeals judges appoint bankruptcy judges, and bankruptcy judges receive cases only on referral from district courts (although every district court in the country has adopted a standing rule automatically referring all bankruptcy filings to bankruptcy judges, see 1 Collier on Bankruptcy ¶3.02[1], p. 3–26 (16th ed. 2014)). The problem is that Congress has also given bankruptcy courts authority to enter final judgments subject only to deferential appellate review, and Article III precludes those judgments when they involve *Stern* claims. The fact that Article III judges played a role in the Article III violation does not remedy the constitutional harm. We have already explained why.

It is a fundamental principle that no branch of government can delegate its constitutional functions to an actor who lacks authority to exercise those functions. See *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 472 (2001); *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 311 (1936). Such delegations threaten liberty and thwart accountability by empowering entities that lack the structural protections the Framers carefully devised. See *Department of Transportation* v. *Association of American Railroads*, 575 U. S. ___, ___–___ (2015) (ALITO, J., concurring) (slip op., at 6–7); *id.*, at ___–___ (THOMAS, J., concurring in judgment) (slip op., at 2–3); *Mistretta* v. *United States*, 488 U. S. 361, 417–422 (1989) (SCALIA, J., dissenting). Article III judges have no constitutional authority to delegate the judicial power—the power to "render dispositive judgments"—to non-Article III judges, no matter how closely they control or supervise their work. *Plaut*, 514 U. S., at 219 (internal quotation marks omitted).

In any event, the majority's arguments about supervision and control are not new. They were considered and rejected in *Stern*. See 564 U. S., at ___ (slip op., at 36) ("it does not matter who appointed the bankruptcy judge or authorized the judge to render final judgments"); see also

*Northern Pipeline*, 458 U. S., at 84–86 (plurality opinion); *id.*, at 91 (Rehnquist, J., concurring in judgment). The majority points to no differences between the bankruptcy proceeding in *Stern* and the bankruptcy proceeding here, except for Sharif's purported consent. The majority thus treats consent as "dispositive" in curing the structural separation of powers violation—precisely what *Schor* said consent could not do. 478 U. S., at 851.

### C

Eager to change the subject from *Stern*, the majority devotes considerable attention to defending the authority of magistrate judges, who may conduct certain proceedings with the consent of the parties under 28 U. S. C. §636. No one here challenges the constitutionality of magistrate judges or disputes that they, like bankruptcy judges, may issue reports and recommendations that are reviewed *de novo* by Article III judges. The cases about magistrate judges cited by the majority therefore have little bearing on this case, because none of them involved a constitutional challenge to the entry of final judgment by a non-Article III actor. See *Roell* v. *Withrow*, 538 U. S. 580 (2003) (statutory challenge only); *Peretz* v. *United States*, 501 U. S. 923 (1991) (challenge to a magistrate judge's conduct of *voir dire* in a felony trial); *Gomez* v. *United States*, 490 U. S. 858 (1989) (same).

The majority also points to 19th-century cases in which courts referred disputes to non-Article III referees, masters, or arbitrators. *Ante*, at 8. In those cases, however, it was the Article III court that ultimately entered final judgment. *E.g., Thornton* v. *Carson*, 7 Cranch 596, 600 (1813) ("the Court was right in entering the judgment for the sums awarded"). Article III courts do refer matters to non-Article III actors for assistance from time to time. This Court does so regularly in original jurisdiction cases. See, *e.g., Kansas* v. *Nebraska*, 574 U. S. ___, ___ (2015)

(slip op., at 1). But under the Constitution, the "ultimate responsibility for deciding" the case must remain with the Article III court. *Id.,* at ___ (slip op., at 6) (quoting *Colorado* v. *New Mexico*, 467 U. S. 310, 317 (1984)).

The concurrence's comparison of bankruptcy judges to arbitrators is similarly inapt. *Ante*, at 1 (opinion of ALITO, J.). Arbitration is "a matter of contract" by which parties agree to resolve their disputes in a private forum. *Rent-A-Center, West, Inc.* v. *Jackson*, 561 U. S. 63, 67 (2010). Such an arrangement does not implicate Article III any more than does an agreement between two business partners to submit a difference of opinion to a mutually trusted friend. Arbitration agreements, like most private contracts, can be enforced in court. And Congress, pursuant to its Commerce Clause power, has authorized district courts to enter judgments enforcing arbitration awards under certain circumstances. See 9 U. S. C. §9. But this ordinary scheme of contract enforcement creates no constitutional concern. As the concurrence acknowledges, only Article III judges—not arbitrators—may enter final judgments enforcing arbitration awards. *Ante*, at 1.

The discussion of magistrate judges, masters, arbitrators, and the like fits with the majority's focus on the supposedly dire consequences that would follow a decision that parties cannot consent to the final adjudication of *Stern* claims in bankruptcy courts. Of course, it "goes without saying" that practical considerations of efficiency and convenience cannot trump the structural protections of the Constitution. *Stern*, 564 U. S., at ___ (slip op., at 36); see *Perez*, 575 U. S., at ___ (THOMAS, J., concurring in judgment) (slip op., at 20) ("Even in the face of perceived necessity, the Constitution protects us from ourselves."). And I find it hard to believe that the Framers in Philadelphia, who took great care to ensure that the Judiciary was "truly distinct" from the Legislature, would have been comforted to know that Congress's incursion here could

"only be termed *de minimis.*"  *Ante,* at 13 (quoting *Schor*, 478 U. S., at 856).

In any event, the majority overstates the consequences of enforcing the requirements of Article III in this case.  As explained in Part I, Wellness's claim may not be a *Stern* claim, in which case the bankruptcy statute would apply precisely as Congress wrote it.  Even if Wellness's claim were a *Stern* claim, the District Court would not need to start from scratch.  As this Court held in *Arkison,* the District Court could treat the bankruptcy judge's decision as a recommendation and enter judgment after performing *de novo* review.  573 U. S., at ___ (slip op., at 4).

In *Stern*, the Court cautioned that Congress "may no more lawfully chip away at the authority of the Judicial Branch than it may eliminate it entirely."  564 U. S., at ___ (slip op., at 37).  The majority sees no reason to fret, however, so long as two private parties consent.  *Ante,* at 14, n. 10.  But such parties are unlikely to carefully weigh the long-term structural independence of the Article III judiciary against their own short-term priorities.  Perhaps the majority's acquiescence in this diminution of constitutional authority will escape notice.  Far more likely, however, it will amount to the kind of "blueprint for extensive expansion of the legislative power" that we have resisted in the past.  *PCAOB*, 561 U. S., at 500 (quoting *Metropolitan Washington Airports Authority* v. *Citizens for Abatement of Aircraft Noise, Inc.*, 501 U. S. 252, 277 (1991)).

The encroachment at issue here may seem benign enough.  Bankruptcy judges are devoted professionals who strive to be fair to all sides, and litigants can be trusted to protect their own interests when deciding whether to consent.  But the fact remains that Congress controls the salary and tenure of bankruptcy judges, and the Legislature's present solicitude provides no guarantee of its future restraint.  See *Glidden Co.* v. *Zdanok*, 370 U. S. 530, 534 (1962) (plurality opinion).  Once Congress knows that

it can assign federal claims to judges outside Article III
with the parties' consent, nothing would limit its exercise
of that power to bankruptcy. Congress may consider it
advantageous to allow claims to be heard before judges
subject to greater legislative control in any number of
areas of federal concern. As for the requirement of con-
sent, Congress can find ways to "encourage" consent, say
by requiring it as a condition of federal benefits. That has
worked to expand Congress's power before. See, *e.g.*,
*College Savings Bank* v. *Florida Prepaid Postsecondary
Ed. Expense Bd.*, 527 U. S. 666, 686 (1999) ("Congress
may, in the exercise of its spending power, condition its
grant of funds to the States upon their taking certain
actions that Congress could not require them to take");
*South Dakota* v. *Dole*, 483 U. S. 203, 207 (1987) (same).

Legislative designs of this kind would not displace the
Article III judiciary overnight. But steady erosion of
Article III authority, no less than a brazen usurpation,
violates the constitutional separation of powers. In a
Federal Government of limited powers, one branch's loss is
another branch's gain, see *PCAOB*, 561 U. S., at 500, so
whether a branch aims to "arrogate power to itself" or to
"impair another in the performance of its constitutional
duties," the Constitution forbids the transgression all the
same. *Loving*, 517 U. S., at 757. As we have cautioned,
"[s]light encroachments create new boundaries from which
legions of power can seek new territory to capture." *Stern*,
564 U. S., at \_\_\_ (slip op., at 38) (internal quotation marks
omitted).

The Framers understood this danger. They warned that
the Legislature would inevitably seek to draw greater
power into its "impetuous vortex," The Federalist No. 48,
at 309 (J. Madison), and that "power over a man's subsist-
ence amounts to a power over his will," *id.*, No. 79, at 472
(A. Hamilton) (emphasis deleted). In response, the Fram-
ers adopted the structural protections of Article III, "es-

tablishing high walls and clear distinctions because low walls and vague distinctions will not be judicially defensible in the heat of interbranch conflict." *Plaut*, 514 U. S., at 239. As this Court once put it, invoking Frost, "Good fences make good neighbors." *Id.*, at 240.

Ultimately, however, the structural protections of Article III are only as strong as this Court's will to enforce them. In Madison's words, the "great security against a gradual concentration of the several powers in the same department consists in giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others." The Federalist No. 51, at 321–322 (J. Madison). The Court today declines to resist encroachment by the Legislature. Instead it holds that a single federal judge, for reasons adequate to him, may assign away our hard-won constitutional birthright so long as two private parties agree. I hope I will be wrong about the consequences of this decision for the independence of the Judicial Branch. But for now, another literary passage comes to mind: It profits the Court nothing to give its soul for the whole world . . . but to avoid *Stern* claims?

I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

No. 13–935

WELLNESS INTERNATIONAL NETWORK, LIMITED, ET AL, PETITIONERS *v.* RICHARD SHARIF

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[May 26, 2015]

JUSTICE THOMAS, dissenting.

Like THE CHIEF JUSTICE, I would have remanded this case to the lower courts to determine, under the proper standard, whether Wellness' alter-ego claim is a *Stern* claim. See *Stern* v. *Marshall*, 564 U. S. \_\_\_ (2011). I write separately to highlight a few questions touching on the consent issue that merit closer attention than either the Court or THE CHIEF JUSTICE gives them.

I agree with THE CHIEF JUSTICE that individuals cannot consent to violations of the Constitution, but this principle has nothing to do with whose interest the violated provision protects. Anytime the Federal Government acts in a manner inconsistent with the separation of powers, it acts in excess of its constitutional authority. That authority is carefully defined by the Constitution, and, except through Article V's amendment process, that document does not permit individuals to bestow additional power upon the Government.

The majority today authorizes non-Article III courts to adjudicate, with consent, claims that we have held to require an exercise of the judicial power based on its assessment that few "structural interests" are implicated by consent to the adjudication of *Stern* claims. See *ante,* at 7, 12. That reasoning is flawed. It matters not whether *we* think the particular violation threatens the structure of

our Government. Our duty is to enforce the Constitution as written, not as revised by private consent, innocuous or otherwise. Worse, amidst the tempest over whether "structural interests" are implicated when an individual consents to adjudication of *Stern* claims by a non-Article III court, both the majority and THE CHIEF JUSTICE fail to grapple with the antecedent question: whether a violation of the Constitution has actually occurred. That question is a difficult one, and the majority makes a grave mistake by skipping over it in its quest to answer the question whether consent can authorize a constitutional violation. Because I would resolve this case on narrower grounds, I need not decide that question here. I nevertheless write separately to highlight the complexity of the issues the majority simply brushes past.

## I

### A

"The principle, that [the Federal Government] can exercise only the powers granted to it, . . . is now universally admitted." *McCulloch* v. *Maryland*, 4 Wheat. 316, 405 (1819). A corollary to this principle is that each branch of the Government is limited to the exercise of those powers granted to it. Every violation of the separation of powers thus involves an exercise of power in excess of the Constitution. And because the only authorities capable of granting power are the Constitution itself, and the people acting through the amendment process, individual consent cannot authorize the Government to exceed constitutional boundaries.

This does not mean, however, that consent is invariably irrelevant to the constitutional inquiry. Although it may not authorize a constitutional violation, consent may prevent one from occurring in the first place. This concept is perhaps best understood with the example on which the majority and THE CHIEF JUSTICE both rely: the right to a

jury trial. *Ante,* at 9 (majority opinion); *ante,* at 11 (ROBERTS, C. J., dissenting).[1]  Although the Government incurably contravenes the Constitution when it acts in *violation* of the jury trial right, our precedents permit the Government to convict a criminal defendant without a jury trial when he waives that right. See *Brady* v. *United States*, 397 U. S. 742, 748 (1970). The defendant's waiver is thus a form of consent that lifts a limitation on government action by satisfying its terms—that is, the right is exercised and honored, not disregarded. See *Patton* v. *United States*, 281 U. S. 276, 296–298 (1930), abrogated on other grounds by *Williams* v. *Florida*, 399 U. S. 78 (1970). Provided the Government otherwise acts within its powers, there is no constitutional violation.

## B

Consent to the adjudication of *Stern* claims by bankruptcy courts is a far more complex matter than waiver of a jury trial. Two potential violations of the separation of powers occur whenever bankruptcy courts adjudicate *Stern* claims.  First, the bankruptcy courts purport to exercise power that the Constitution vests exclusively in the judiciary, even though they are not Article III courts because bankruptcy judges do not enjoy the tenure and salary protections required by Article III. See Art. III, §1. Second, the bankruptcy courts act pursuant to statutory authorization that is itself invalid. For even when acting pursuant to an enumerated power, such as the bankruptcy

———————

[1] There is some dispute whether the guarantee of a jury trial protects an individual right, a structural right, or both, raising serious questions about how it should be treated under *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833 (1986). My view, which does not turn on such taxonomies, leaves no doubt: It is a "fundamental reservation of power in our constitutional structure," *Blakely* v. *Washington*, 542 U. S. 296, 306 (2004), meaning its *violation* may not be authorized by the consent of the individual.

power, Congress exceeds its authority when it purports to authorize a person or entity to perform a function that requires the exercise of a power vested elsewhere by the Constitution. See *Whitman* v. *American Trucking Assns., Inc.,* 531 U. S. 457, 472 (2001).

Rather than attempt to grapple with these problems, the majority seizes on some statements from *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833 (1986), to resolve the difficult constitutional issue before us. See *ante,* at 9–12. But to the extent *Schor* suggests that individual consent could authorize non-Article III courts to exercise the judicial power, 478 U. S*.,* at 850–851, it was wrongly decided and should be abandoned. Consent to adjudication by non-Article III judges may waive whatever individual right to impartial adjudication Article III implies, thereby lifting that affirmative barrier on Government action. But non-Article III courts must still act within the bounds of their constitutional authority. That is, they must act through a power properly delegated to the Federal Government and not vested by the Constitution in a different governmental actor. Because the judicial power is vested exclusively in Article III courts, non-Article III courts may not exercise it.

*Schor*'s justification for authorizing such a transgression was that it judged the "practical effect [the allocation would] have on the constitutionally assigned role of the federal judiciary" not to be too great. *Id.,* at 851. But we "can[not] preserve a system of separation of powers on the basis of such intuitive judgments regarding 'practical effects.'" *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33, 70 (1989) (SCALIA, J., concurring in part and concurring in judgment). Put more starkly, "[t]o uphold" a violation of the Constitution because one perceives "the infraction assailed [a]s unimportant when compared with similar but more serious infractions which might be conceived . . . is not to interpret that instrument, but to disregard it."

*Patton*, *supra,* at 292. Our Constitution is not a matter of convenience, to be invoked when we feel uncomfortable with some Government action and cast aside when we do not. See *Perez* v. *Mortgage Bankers Assn.*, *ante,* at 5 (THOMAS, J., concurring in judgment).

## II

Properly understood, then, the answer to the consent question in this case depends on whether bankruptcy courts act within the bounds of their constitutional authority when they adjudicate *Stern* claims with the consent of the parties. In order to answer that question, we must consider what form of governmental power that type of adjudication requires and whether bankruptcy courts are qualified to exercise that power. *Department of Transportation* v. *Association of American Railroads*, *ante,* at 24 (THOMAS, J., concurring in judgment).

Many Government functions "may be performed by two or more branches without either exceeding its enumerated powers under the Constitution." *Ante,* at 4. Certain core functions, however, demand the exercise of legislative, executive, or judicial power, and their allocation is controlled by the Vesting Clauses contained in the first three articles of the Constitution. *Ibid.* We have already held that adjudicating *Stern* claims, at least *without* consent of the parties, requires an exercise of the judicial power vested exclusively in Article III courts. *Stern*, 564 U. S., at \_\_\_–\_\_\_ (slip op., at 28–29). The difficult question presented by this case, which the Court glosses over, is whether the parties' consent somehow transforms the nature of the power exercised.

## A

As the concepts were understood at the time of the

founding, the legislative, executive, and judicial powers played different roles in the resolution of cases and controversies. In this context, the judicial power is the power "to determine all differences according to the established law"; the legislative power is the power to make that "established law"; and the executive power is the power "to back and support the sentence, and to give it due execution." J. Locke, Second Treatise of Civil Government §§124–126, pp. 62–63 (J. Gough ed. 1947) (Locke); see also *Wayman* v. *Southard*, 10 Wheat. 1, 46 (1825).

It should be immediately apparent that consent does not transform the adjudication of *Stern* claims into a function that requires the exercise of legislative or executive power. Parties by their consent do not transform the function of adjudicating controversies into the functions of creating rules or enforcing judgments.

The more difficult question is whether consent somehow eliminates the need for an exercise of the judicial power. Our precedents reveal that the resolution of certain cases or controversies requires the exercise of that power, but that others "may or may not" be brought "within the cognizance of [Article III courts], as [Congress] deem[s] proper." *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 284 (1856). The distinction generally has to do with the types of rights at issue. Disposition of private rights to life, liberty, and property falls within the core of the judicial power, whereas disposition of public rights does not. From that core of the judicial power, we have identified two narrow historical exceptions. Those exceptions, along with the treatment of cases or controversies not falling within that core, provide useful guidance for understanding whether bankruptcy courts' adjudication of *Stern* claims with the consent of the parties requires the exercise of Article III judicial power.

1

Under our precedents, the three categories of cases that may be adjudicated by Article III courts but that do not demand the exercise of the judicial power are those arising in the territories, those arising in the Armed Forces, and those involving public-rights disputes. *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 63–67 (1982) (plurality opinion).

The first two represent unique historical exceptions that tell us little about the overall scope of the judicial power. From an early date, this Court has long upheld laws authorizing the adjudication of cases arising in the territories in non-Article III "territorial courts" on the ground that such courts exercise power "conferred by Congress, in the execution of those general powers which [Congress] possesses over the territories of the United States." *American Ins. Co.* v. *356 Bales of Cotton*, 1 Pet. 511, 546 (1828) (*Canter*).[2]  And the Court has upheld laws authorizing the

---

[2] Chief Justice Marshall's explanation in *Canter* has come under attack on the ground that it fails to clarify the precise constitutional status of the power exercised by the territorial courts. Lawson, Territorial Governments and the Limits of Formalism, 78 Cal. L. Rev. 853, 892 (1990) (criticizing it as "fatuous" dictum). On the one hand, some early evidence suggests that the courts were thought to be dealing primarily with local matters that lie *beyond* federal judicial cognizance. Pfander, Article I Tribunals, Article III Courts, and the Judicial Power of the United States, 118 Harv. L. Rev. 643, 706–711 (2004). Yet *Canter* involved a controversy indisputably *capable* of adjudication by Article III courts, because it both arose in admiralty and fell within the Supreme Court's appellate jurisdiction. Pfander, *supra*, at 713–714, n. 314. The best explanation for this apparent tension is that territorial courts adjudicate matters that Congress may or may not assign to Article III courts, as it wishes. Nelson, Adjudication in the Political Branches, 107 Colum. L. Rev. 559, 575–576 (2007). To recognize Congress' discretion requires no distortion of the meaning of judicial power because Chief Justice Marshall's reasoning has nothing to do with the intrinsic qualities of the adjudication itself—*e.g.,* whether it involves "the stuff of the traditional actions at common law tried by the

adjudication of cases arising in the Armed Forces in non-Article III courts-martial, inferring from a constellation of constitutional provisions that Congress has the power to provide for the adjudication of disputes among the Armed Forces it creates and that Article III extends only to *civilian* judicial power. *Dynes* v. *Hoover*, 20 How. 65, 78–79 (1858). Whatever their historical validity, these precedents exempt cases arising in the territories and in the land and naval forces from Article III because of other provisions of the Constitution, not because of the definition of judicial power in Article III itself. See Nelson, Adjudication in the Political Branches, 107 Colum. L. Rev. 559, 576 (2007) (noting that both exceptions enjoy "special textual rationales that d[o] not spill over into other areas").

The third category consists of so-called "public rights" cases. Unlike the other two categories, which reflect carve-outs from the core of the judicial power, this category describes cases outside of that core and therefore has more to tell us about the scope of the judicial power.

The distinction between disputes involving "public rights" and those involving "private rights" is longstanding, but the contours of the "public rights" doctrine have been the source of much confusion and controversy. See generally *Granfinanciera*, 492 U. S., at 66–70 (opinion of SCALIA, J.) (tracing the evolution of the doctrine). Our cases attribute the doctrine to this Court's mid-19th century decision, *Murray's Lessee*, *supra*. In that case, the Court observed that there are certain cases addressing "*public rights*, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the

_____

courts of Westminster in 1789," *Stern* v. *Marshall*, 564 U. S. ___, ___ (2011) (slip op., at 18) (internal quotation marks omitted).

courts of the United States, as it may deem proper." *Id.,* at 284 (emphasis added).

Historically, "*public* rights" were understood as "rights belonging to the people at large," as distinguished from "the *private* unalienable rights of each individual." *Lansing* v. *Smith*, 4 Wend. 9, 21 (N. Y. 1829) (Walworth, C.). This distinction is significant to our understanding of Article III, for while the legislative and executive branches may dispose of public rights at will—including through non-Article III adjudications—an exercise of the judicial power is required "when the government want[s] to act authoritatively upon core private rights that had vested in a particular individual." Nelson, *supra,* at 569; see *B&B Hardware, Inc.* v. *Hargis Industries, Inc.*, *ante,* at 11 (THOMAS, J., dissenting).

The distinction was well known at the time of the founding. In the tradition of John Locke, William Blackstone in his Commentaries identified the private rights to life, liberty, and property as the three "absolute" rights—so called because they "appertain[ed] and belong[ed] to particular men . . . merely as individuals," not "to them as members of society [or] standing in various relations to each other"—that is, not dependent upon the will of the government. 1 W. Blackstone, Commentaries on the Laws of England 119 (1765) (Commentaries); see also Nelson, *supra,* at 567.[3] Public rights, by contrast, belonged to "the whole community, considered as a community, in its social aggregate capacity." 4 Commentaries 5 (1769); see also Nelson, *supra,* at 567. As the modern doctrine of the

_____

[3] The protection of private rights in the Anglo-American tradition goes back to at least Magna Carta. The original 1215 charter is replete with restrictions on the King's ability to proceed against private rights, including most notably the provision that "[n]o free man shall be taken, imprisoned, disseised, outlawed, banished, or in any way destroyed, . . . except by the lawful judgment of his peers and by the law of the land." A. Howard, Magna Carta: Text and Commentary 43 (1964).

separation of powers emerged, "the courts became identi-
fied with the enforcement of private right, and administra-
tive agencies with the execution of public policy."  Jaffe,
The Right to Judicial Review I, 71 Harv. L. Rev. 401, 413
(1958).

The Founders carried this idea forward into the Vesting
Clauses of our Constitution.  Those Clauses were under-
stood to play a role in ensuring that the federal courts
alone could act to deprive individuals of private rights
because the power to act conclusively against those rights
was the core of the judicial power.  As one early treatise
explained, the judiciary is "that department of the gov-
ernment to whom the protection of the rights of the indi-
vidual is by the constitution especially confided."  1 St.
George Tucker, Blackstone's Commentaries, App. 357
(1803).  If "public rights" were not thought to fall within
the core of the judicial power, then that could explain why
Congress would be able to perform or authorize non-
Article III adjudications of public rights without trans-
gressing Article III's Vesting Clause.

Nineteenth-century American jurisprudence confirms
that an exercise of the judicial power was thought to be
necessary for the disposition of private, but not public,
rights.[4]  See *B&B Hardware*, *ante,* at 12.  The treatment of

———————

[4] Contemporary state-court decisions provide even more explication of
the distinction between public and private rights, and many expressly
tie the distinction to the separation of powers.  See, *e.g., Newland* v.
*Marsh*, 19 Ill. 376, 383 (1857) ("The legislative power . . . cannot di-
rectly reach the property or vested rights of the citizen, by providing for
their forfeiture or transfer to another, without trial and judgment in
the courts; for to do so, would be the exercise of a power which belongs
to another branch of the government, and is forbidden to the legisla-
ture"); see also *Gaines* v. *Gaines*, 48 Ky. 295, 301 (1848) (describing the
judiciary as "the tribunal appointed by the Constitution and the law,
for the ascertainment of private rights and the redress of private
wrongs"); *State ex rel. Atty. Gen.* v. *Hawkins*, 44 Ohio St. 98, 109, 5 N. E.
228, 232 (1886) ("[P]ower to hear and determine rights of property and

land patents illustrates the point well: Although Congress could authorize executive agencies to dispose of *public* rights in land—often by means of adjudicating a claimant's qualifications for a land grant under a statute—the United States had to go to the courts if it wished to revoke a patent. See generally Nelson, 107 Colum. L. Rev.*,* at 577–578 (discussing land patents). That differential treatment reflected the fact that, once "legal title passed out of the United States," the patent "[u]ndoubtedly" constituted "a vested right" and consequently could "only be divested according to law." *Johnson* v. *Towsley*, 13 Wall. 72, 84–85 (1871). By contrast, a party who sought to protect only a "public right" in the land had no such vested right and could not invoke the intervention of Article III courts. See *Smelting Co.* v. *Kemp*, 104 U. S. 636, 647 (1882) ("It does not lie in the mouth of a stranger to the title to complain of the act of the government with respect to it"); see also *Bagnell* v. *Broderick*, 13 Pet. 436, 450 (1839) (refusing to examine the propriety of a land patent on the ground that "Congress has the sole power to declare the dignity and effect of titles emanating from the United States").

Over time, the line between public and private rights has blurred, along with the Court's treatment of the judicial power. See *B&B Hardware, ante,* at 9–10, 12. The source of the confusion may be *Murray's Lessee*—the putative source of the public rights doctrine itself. Dictum in the case muddles the distinction between private and public rights, and the decision is perhaps better read as an expression of the principle of sovereign immunity. *Granfinanciera*, 492 U. S.*,* at 68–69 (opinion of

--------

of person between private parties is judicial, and can only be conferred on the courts"); see generally T. Cooley, Constitutional Limitations 175 (1868) (explaining that only the judicial power was thought capable of disposing of private rights).

SCALIA, J.).[5]  Some cases appear to have done just that, thus reading *Murray's Lessee* to apply only in disputes arising between the Government and others.  See, *e.g., Crowell* v. *Benson*, 285 U. S. 22, 50 (1932).

Another strain of cases has confused the distinction between private and public rights, with some cases treating public rights as the equivalent of private rights entitled to full judicial review, *American School of Magnetic Healing* v. *McAnnulty*, 187 U. S. 94, 108 (1902), and others treating what appear to be private rights as public rights on which executive action could be conclusive, see, *e.g., Sunshine Anthracite Coal Co.* v. *Adkins*, 310 U. S. 381, 401–404 (1940); see also *B&B Hardware*, *ante*, at 12 (observing that *Sunshine Anthracite* may reflect a unique historical exception for tax cases).  Cf. *Northern Pipeline*, 458 U. S., at 84–85 (plurality opinion) (discussing other cases that appear to reflect the historical distinction between private rights and rights created by Congress). Perhaps this confusion explains why the Court has more recently expanded the concept of public rights to include any right "so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary."  *Thomas* v. *Union Carbide Agricultural Products Co.*, 473 U. S. 568, 593–594 (1985).  A return to the

––––––––

[5]Another potential explanation is that *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272 (1856), recognized yet another special exception to Article III's allocation of judicial power, applicable whenever the Government exercises its power of taxation.  Nelson, Adjudication in the Political Branches, 107 Colum. L. Rev. 559, 588–589 (2007); see also *B&B Hardware, Inc.* v. *Hargis Industries, Inc.*, *ante,* at 12 (THOMAS, J., dissenting) (discussing other decisions that appear to rest on this exception).  To the extent that *Murray's Lessee* purported to recognize such an exception, how-ever, it did so only in dictum after noting that the statute provided a mechanism for judicial review of the accounting decision on which the distress warrant was based.  18 How., at 280–281.

historical understanding of "public rights," however, would lead to the conclusion that the inalienable core of the judicial power vested by Article III in the federal courts is the power to adjudicate *private* rights disputes.

2

Although Congress did not enact a permanent federal bankruptcy law until the late 19th century, it has assigned the adjudication of certain bankruptcy disputes to non-Article III actors since as early as 1800. Plank, Why Bankruptcy Judges Need Not and Should Not Be Article III Judges, 72 Am. Bankr. L. J. 567, 608 (1998) (describing the bankruptcy powers vested by Congress in non-Article III judges). Modern bankruptcy courts, however, adjudicate a far broader array of disputes than their earliest historical counterparts. And this Court has remained carefully noncommittal about the source of their authority to do so. See *Northern Pipeline*, 458 U. S., at 71 (plurality opinion).

Applying the historical categories of cases discussed above, one can understand why. Bankruptcy courts clearly do not qualify as territorial courts or courts-martial, but they are not an easy fit in the "public rights" category, either. No doubt certain aspects of bankruptcy involve rights lying outside the core of the judicial power. The most obvious of these is the right to discharge, which a party may obtain if he satisfies certain statutory criteria. *Ibid.* Discharge is not itself a private right, but, together with the claims allowance process that precedes it, it can act conclusively on the core private rights of the debtor's creditors. We have nevertheless implicitly recognized that the claims allowance process may proceed in a bankruptcy court, as can any matter that would necessarily be resolved by that process, even one that affects core private rights. *Stern*, 564 U. S., at \_\_\_–\_\_\_ (slip op., at 30–31). For this reason, bankruptcy courts and their prede-

cessors more likely enjoy a unique, textually based exception, much like territorial courts and courts-martial do. See *id.,* at ___ (SCALIA, J., concurring) (slip op., at 2). That is, Article I's Bankruptcy Clause serves to carve cases and controversies traditionally subject to resolution by bankruptcy commissioners out of Article III, giving Congress the discretion, within those historical boundaries, to provide for their resolution outside of Article III courts.

3

Because *Stern* claims by definition fall outside of the historical boundaries of the bankruptcy carve-out, they are subject to Article III. This means that, if their adjudication requires the exercise of the judicial power, then only Article III courts may perform it.

Although *Stern* claims indisputably involve private rights, the "public rights" doctrine suggests a way in which party consent may transform the function of adjudicating *Stern* claims into one that does not require the exercise of the judicial power. The premise of the "public rights" doctrine, as described above, is not that public rights affirmatively require adjudication by some other governmental power, but that the Government has a freer hand when private rights are not at issue. Accordingly, this premise may not require the presence of a public right at all, but may apply equally to any situation in which private rights are not asserted.

Party consent, in turn, may have the effect of lifting that "private rights" bar, much in the way that waiver lifts the bar imposed by the right to a jury trial. Individuals may dispose of their own private rights freely, without judicial intervention. A party who consents to adjudication of a *Stern* claim by a bankruptcy court is merely making a conditional surrender of whatever private right he has on the line, contingent on some future event—namely, that

the bankruptcy court rules against him.  Indeed, it is on
this logic that the law has long encouraged and permitted
private settlement of disputes, including through the
action of an arbitrator not vested with the judicial power.
See *ante,* at 1 (ALITO, J., concurring in part and concurring
in judgment); T. Cooley, Constitutional Limitations 399
(1868).  Perhaps for this reason, decisions discussing the
relationship between private rights and the judicial power
have emphasized the "*involuntary* divestiture" of a private
right.  *Newland* v. *Marsh*, 19 Ill. 376, 382–383 (1857)
(emphasis added).

But all of this does not necessarily mean that the major-
ity has wound up in the right place by the wrong path.
Even if consent could lift the private-rights barrier to non-
judicial Government action, it would not necessarily follow
that consent removes the *Stern* adjudication from the core
of the judicial power.  There may be other aspects of the
adjudication that demand the exercise of the judicial
power, such as entry of a final judgment enforceable with-
out any further action by an Article III court.  We have
recognized that judgments entered by Article III courts
bear unique qualities that spring from the exercise of the
judicial power, *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S.
211, 218–219 (1995), and it may be that the entry of a
final judgment bearing these qualities—irrespective of the
subject matter of the dispute—is a quintessential judicial
function.  See *ante,* at 16–17 (ROBERTS, C. J., dissenting).
See generally *Northern Pipeline, supra*, at 85–86, and n.
38 (plurality opinion) (distinguishing the agency orders at
issue in *Crowell* from bankruptcy court orders on this
ground).  As Thomas Cooley explained in his influential
treatise, "If the judges should sit to hear . . . controversies
[beyond their cognizance], they would not sit as a court; at
the most they would be arbitrators only, and their . . .
decision could not be binding as a judgment, but only as

an award."  Cooley, *supra,* at 399.[6]

Ultimately, this case implicates difficult questions about the nature of bankruptcy procedure, judicial power, and remedies.  In particular, if we were to determine that current practice accords bankruptcy court judgments a feature that demands the exercise of the judicial power, would that mean that all bankruptcy judgments resolving *Stern* claims are void, or only that courts may not give effect to that single feature that triggers Article III?  The parties have briefed none of these issues, so I do not resolve them.  But the number and magnitude of these important questions—questions implicated by thousands of bankruptcy and magistrate judge decisions each year—merit closer attention than the majority has given them.

---

[6] Numerous 19th-century State Supreme Courts held unconstitutional laws authorizing individuals to consent to have their cases heard by an individual not qualified as a judge under provisions of State Constitutions similar to Article III, §1.  See, *e.g., Winchester* v. *Ayres*, 4 Iowa 104 (1853); *Haverly Invincible Mining Co.* v. *Howcutt*, 6 Colo. 574, 575–576 (1883); *Ex parte Alabama State Bar Assn.*, 92 Ala. 113, 8 So. 768 (1891); see also Cooley, Constitutional Limitations, at 399.  Acknowledging the similarity between the practices under review and the legitimate practice of private arbitration, many of these decisions premised their finding of unconstitutionality on the issuance of a judgment or other writ that only judges may issue.  See, *e.g., Bishop* v. *Nelson*, 83 Ill. 601 (1876) (*per curiam*) ("This was not an arbitration . . . but it was an attempt to confer upon [Mr. Wood] the power of a judge, to decide the pending case, and he did decide it, the court carrying out his decision by entering the judgment he had reached, and not [its] own judgment"); *Van Slyke* v. *Trempealeau Cty. Farmers' Mut. Fire Ins. Co.*, 39 Wis. 390, 393 (1876) ("We cannot look into the bill of exceptions or consider the order denying a new trial, because both are unofficial and devoid of judicial authority"); see also *id.,* at 395–396 (tracing this rule back to English understandings of judicial power).  These decisions treat the rule as a corollary to the rule that parties may not, by consent, confer jurisdiction.  See, *e.g., Higby* v. *Ayres*, 14 Kan. 331, 334 (1875); *Hoagland* v. *Creed*, 81 Ill. 506, 507–508 (1876); see also Cooley, *supra,* at 399.

## B

Even assuming we were to decide that adjudication of *Stern* claims with the consent of the parties does not require the exercise of the judicial power, that decision would not end the constitutional inquiry. As instrumentalities of the Federal Government, the bankruptcy courts must act pursuant to some constitutional grant of authority. Even if the functions bankruptcy courts perform do not require an exercise of legislative, executive, or judicial power, we would need to identify the source of Congress' authority to establish them and to authorize them to act.

The historical carve-outs for territorial courts and courts-martial might provide some guidance. The Court has anchored Congress' authority to create territorial courts in "the general right of sovereignty which exists in the government, or in virtue of that clause which enables Congress to make all needful rules and regulations, respecting the territory belonging to the United States." *Canter*, 1 Pet., at 546. And it has anchored Congress' authority to create courts-martial in Congress' Article I powers concerning the Army and Navy, understood alongside the Sixth Amendment's exception of "'cases arising in the land or naval forces,'" from the grand jury requirement, and Article II's requirement that the President serve as commander in chief. *Dynes*, 20 How., at 78–79.

Although our cases examining the constitutionality of statutes allocating the power to the bankruptcy courts have not considered the source of Congress' authority to establish them, the obvious textual basis is the fourth clause of Article I, §8, which empowers Congress to "establish . . . uniform Laws on the subject of Bankruptcies throughout the United States."[7] But as with the other two

--------

[7] In *Northern Pipeline*, the plurality rejected the argument that "Congress' constitutional authority to establish 'uniform Laws on the subject of Bankruptcies throughout the United States' carries with it an

historical carve-outs, Congress' power to establish tribunals within that grant is informed by historical understandings of the bankruptcy power.[8]  We have suggested that, under this historical understanding, Congress has the power to establish bankruptcy courts that exercise jurisdiction akin to that of bankruptcy commissioners in England, subject to review traditionally had in England. *Ante,* at 3–4 (ROBERTS, C. J., dissenting).  Although *Stern* claims, by definition, lie outside those historical boundaries, a historical practice of allowing broader adjudication by bankruptcy commissioners acting with the consent of the parties could alter the analysis.  The parties once again do not brief these questions, but they merit closer attention by this Court.

\*    \*    \*

Whether parties may consent to bankruptcy court adjudication of *Stern* claims is a difficult constitutional question.  It turns on issues that are not adequately considered by the Court or briefed by the parties.  And it cannot—and should not—be resolved through a cursory reading of *Schor*, which itself is hardly a model of careful constitutional interpretation.  For these reasons, I would resolve

---

inherent power to establish legislative courts capable of adjudicating 'bankruptcy-related controversies.'" *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 72 (1982) (plurality opinion) (citation omitted).  In that context, however, it was considering whether Article III imposes limits on Congress' bankruptcy power, *id.,* at 73, which is a distinct question from whether Congress has the power to establish bankruptcy courts as an antecedent matter, leaving aside any Article III limitations.

[8] I would be wary of concluding that every grant of lawmaking authority to Congress includes the power to establish "legislative courts" as part of its legislative scheme.  Some have suggested that Congress' authority to establish tribunals pursuant to substantive grants of authority is informed and limited by its Article I power to "constitute Tribunals inferior to the supreme Court,"  U. S. Const., Art. I, §8 cl. 9.  See Pfander, 118 Harv. L. Rev., at 671–697.

the case on the narrow grounds set forth in Part I of THE CHIEF JUSTICE's opinion.  I respectfully dissent.